No. 104,565

STATE OF KANSAS, *Appellee*, v. KATRON HARRIS, *Appellant*.
(306 P.3d 282)

Opinion filed August 16, 2013.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Sheryl L. Lidtke*, deputy district attorney, argued the cause, and *Jerome A. Gorman*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: Katron Harris appeals his convictions of aggravated robbery and first-degree felony murder based on the underlying felony of aggravated robbery. He argues: (1) The State presented insufficient evidence to prove the aggravated robbery was accomplished by "threat of bodily harm," which was how the crime was charged; (2) the district court abused its discretion in denying his request for a mistrial based on prosecutorial misconduct; and (3) the phrase "in the commission of, attempt to commit, or flight from an inherently dangerous felony" in the felony-murder statute, K.S.A. 21-3401(b), creates alternative means of committing the crime and the evidence was insufficient to support each means. We affirm.

## Factual and Procedural Background

The State charged Harris with felony murder, alleging he and two others intentionally killed Phillip Martin in the perpetration, attempt to perpetrate, or flight from the inherently dangerous felony of aggravated robbery. In charging the aggravated robbery, the State alleged Harris and the others took money and drugs from Martin exclusively by "threat of bodily harm" while armed with a handgun. The circumstantial evidence supporting this threat of bodily harm element is our principal focus.

On October 6, 2008, police officers responded to a 911 call at a home in Kansas City, Kansas. The officers found the garage door half open, the door into the house from the garage open, and Martin lying dead on his stomach in a small kitchen. Shell casings from two different caliber firearms surrounded Martin's body. Martin had a loaded .22 caliber semi-automatic handgun, with a bullet chambered, and $600 cash in his pants pockets. It appeared he had been cooking crack cocaine (powder cocaine mixed with baking soda and water) in the kitchen at the time he died. The kitchen faucet was running when police arrived.

Over the course of several days detectives investigating the crime learned Harris was involved and detained him. In his first police interview, Harris said he did not know Martin, had nothing to do with the crime, and was staying at a hotel in Johnson County with his girlfriend and his mother when the killing occurred. The detectives ended the interview, booked Harris, and placed him on a 48-hour hold. The next evening detectives interviewed Harris again. This time, Harris changed his story.

He told detectives he met Kelvin Gibson, Jr., the night of the killing. He and Gibson took a walk and met Demarcus Blakeney. Harris said the three men walked to Martin's house and Gibson went inside. Gibson came out and said he was going to rob Martin. Harris said he did not believe Gibson and did not want to rob anyone, so he stood across the street. Gibson instructed Harris to let him and Blakeney know if Harris heard anything. Gibson and Blakeney went into the house.

Harris said he heard approximately 12 gunshots in quick succession after about 5 minutes. He said Blakeney ran out, handed

Harris a gun, and told Harris he had to go into the house and "put in [his] work" so that he would not "snitch" on them. Harris said he entered the house and saw Martin lying motionless on the floor. Gibson then told Harris to shoot Martin, which Harris did one time. Harris said Gibson went through the house because he knew where Martin's things were, and got a box of money. The three then ran. Harris said Gibson gave him $100.

The State charged Harris with felony murder with aggravated robbery as the underlying felony, and with aggravated robbery by threat of bodily harm.

At trial, the State established that Martin sold drugs out of his home. When customers came to buy drugs, they entered through the garage and often were met by a doorman. If there was no doorman, customers knocked on the door. Martin put his proceeds in two shoeboxes. The State presented testimony that 2 days before the murder one shoebox contained $1,900 and the other one contained $3,200. At the crime scene, police found only one shoebox with approximately $2,000. The State also established Gibson was often at Martin's home and ran errands for Martin in exchange for money, gas, and marijuana.

Christina Woody testified she bought marijuana from Martin at 8:45 p.m. on the night of Martin's death. When she entered Martin's house, a man she did not know but later identified as Gibson was sitting on the living room couch. Martin was cooking crack cocaine in his kitchen. After purchasing the marijuana, Woody left.

Brian Houston, Martin's friend, also testified. Houston spent time with Martin nearly every day. He said he called Martin a little after 9 p.m. on the night of the killing, but the call went straight to Martin's voicemail. Houston said he went to Martin's house around 9:30 p.m., exited his car, and saw Gibson wandering around outside. Houston said it was strange that Gibson's car was not at Martin's house. Houston walked up and Gibson gestured for him to come toward the garage. As Houston ducked under the garage door, Gibson stood between Houston and the door to the house and told Houston, "[A]in't nothing going on right now." Houston testified Gibson usually said something like this when Martin was conducting drug business. Houston also noticed Gibson was very

fidgety and that Martin's house was unusually quiet because normally Martin played videos and talked on the phone. Houston left without going inside. Houston continued to call Martin until 11 p.m. but never got an answer.

Martin's sister, Angela Martin, testified she spoke with Martin for 3 to 4 minutes by phone at 10 p.m. She heard several male voices in the house, but nothing struck her as out of the ordinary during the conversation.

Martin's neighbor from down the street testified she heard three gunshots the night Martin was murdered. She said it sounded like the shots came from a vacant house next door. She looked out the window. About 4 or 5 minutes after the shots she saw three black men running down the street. Each wore a black hooded sweatshirt and black pants.

Daneasha Connor testified she found Martin dead at approximately 9 p.m. and called police. Conner concluded Martin knew his killer because he did not usually allow others in the house while cooking drugs and would not turn his back to someone he did not know. Conner also testified she took a gun from Martin's back pocket. She believed Martin trusted the person in his home because he did not use the guns he carried.

An investigating detective testified there was no forced entry into the house and that Martin was shot multiple times. The detective thought Martin was comfortable with the perpetrator(s) being in his home. He also testified Gibson provided Harris' and Blakeney's names to police.

Dr. Erik Mitchell performed Martin's autopsy. He concluded Martin died from gunshot wounds primarily due to blood loss. Mitchell testified Martin had 16 gunshot wounds from at least two weapons, although he could not ascertain the order in which the wounds were inflicted. He concluded none were immediately fatal. He said Martin had a gunshot wound to his foot, an entry wound on the back side of his left leg indicating the shooter was behind him, an entry wound on the back of his right thigh also indicating the shooter was behind him, an entry wound to his left hip with a direction of travel indicating the shooter was behind him, an entry

wound on the back of his left forearm, nine entry wounds to his back, and two entry wounds to his front torso.

The State argued Harris either actively participated in the crimes or aided and abetted Gibson and Blakeney in committing them. The jury found Harris guilty of felony murder and aggravated robbery. The district court imposed consecutive terms of life and 72 months' imprisonment, with lifetime postrelease supervision. Harris timely appealed. Our jurisdiction arises under K.S.A. 22-3601 (life sentence).

## AGGRAVATED ROBBERY BY THREAT OF BODILY HARM

Harris argues there was insufficient evidence to convict him of aggravated robbery, which served as the underlying crime for the felony-murder conviction. Harris contends the State failed to prove beyond a reasonable doubt that the aggravated robbery was accomplished by "threat of bodily harm" as specifically charged. Importantly, he notes, the State did not allege a taking of property by force.

### Standard of Review

When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations. *State v. Qualls*, 297 Kan. 61, Syl. ¶ 1, 298 P.3d 311 (2013).

### Analysis

The district court properly instructed the jury on the following elements of aggravated robbery, modified from PIK Crim. 3d 56.31, based on the way the State charged the crime:

"To establish [aggravated robbery], each of the following claims must be proved:
"1. That the defendant or another intentionally took property, to-wit: money and/or drugs, from the person of or from the presence of Phillip A. Martin;
"2. *That the taking was by threat of bodily harm* to Phillip A. Martin;

"3. That the defendant or another was armed with a dangerous weapon, to-wit: a handgun; and

"4. That this act occurred on or about the 6th day of October, 2008, in Wyandotte County, Kansas." (Emphasis added.)

"Robbery is the taking of property from the person or presence of another *by force or by threat of bodily harm* to any person." (Emphasis added.) K.S.A. 21-3426. The crime is aggravated when the robber is armed with a dangerous weapon or inflicts bodily harm upon any person in the course of the robbery. K.S.A. 21-3427; see *State v. Phillips*, 295 Kan. 929, 941-42, 287 P.3d 245 (2012).

K.S.A. 2008 Supp. 21-3110(25) defines "threat" as a "communicated intent to inflict physical or other harm on any person or on property." But verbally communicating a threat is not required—pointing a gun at the victim is enough. *State v. Washington*, 293 Kan. 732, 738, 268 P.3d 475 (2012) (threat of bodily harm element established by testimony that persons involved were armed and pointed a gun at victim); *State v. Calvin*, 279 Kan. 193, 200, 105 P.3d 710 (2005) (sufficient evidence of threat of bodily harm based on defendant's statement that accomplice pointed gun at the victim while trying to force his way inside victim's house). Moreover, the taking can occur after the threat of harm or the victim's death, as long as it is one continuous transaction. *Cf. State v. Myers*, 230 Kan. 697, 703, 640 P.2d 1245 (1982) (inquiry is whether defendant's conduct "makes it possible for the defendant to take property from the victim's body without resistance").

Harris concedes there is sufficient evidence to support a charge of robbery *by force*. But he points out the State specifically charged him with taking property by threat of bodily harm, and the district court instructed the jury accordingly. Harris asks us to decide whether sufficient evidence supports the State's chosen theory that the taking was exclusively by "threat of bodily harm."

At oral argument, the State claimed it could not have proven robbery by force because there was no evidence of a struggle. And although we need not delve into whether the State's view is correct, we note we have previously held shooting someone is an act of force sufficient to prove aggravated robbery. See, *e.g.*, *State v. Dei-*

*terman,* 271 Kan. 975, 992-93, 29 P.3d 411 (2001) (sufficient evidence of aggravated robbery by force when defendant shot victim twice, took wallet, and entered getaway car); *Myers,* 230 Kan. at 703 (shooting of victim was act of force in aggravated robbery).

In this case, because Martin is dead, there is no direct evidence his shooter(s) communicated a threat to him, and none of Harris' accomplices testified. Therefore, we must determine whether circumstantial evidence supports one or more inferences that Martin was threatened with bodily harm. We have held a conviction "of even the gravest offense" may be based entirely on circumstantial evidence. If an inference is reasonable, the jury has the right to make it. *State v. McCaslin,* 291 Kan. 697, 710-11, 245 P.3d 1030 (2011).

Harris told police Gibson and Blakeney were in Martin's house about 5 minutes before shooting erupted. This was more than enough time to communicate a threat or for Martin to realize he was being robbed at gunpoint, especially given the house's close quarters, as shown on the crime scene video. In addition, because Martin's torso sustained two front entry wounds, it was reasonable to infer both that the shooter(s) were in front of Martin and that Martin would have perceived the threat of gunshot before either wound was inflicted. And although the coroner could not determine the order of the bullet wounds, he did conclude no particular shot was immediately fatal, giving Martin time to understand what was happening even after the first or subsequent shots were fired. But there is more.

Martin was found lying on his stomach on the floor in a small kitchen. The crime scene video showed no blood smears on the floor around his body, which might have suggested he was rolled over onto his back so that he could be shot in the front. This makes it reasonable to infer that of Martin's 16 gunshot wounds, he sustained the front entry wounds sooner rather than later, and likely before he was lying face down on the floor.

Also, the position of Martin's body and layout of the room in which it was found support the State's theory that Martin was shot while standing in a corner pressed between a door and his refrigerator. The crime scene video shows Martin lying with his feet by

a door next to the refrigerator and his head by the sink. And from this, the jury could reasonably infer Martin was not standing at the sink with his back to the shooter when the shooting started because he could not have crumpled to the floor in that fashion. The video also supports a conclusion Martin was not escaping towards a second kitchen door and shot in the back because that door swings into the kitchen rather than outward, making any escape attempt far more cumbersome.

In the end, the evidence supports inferences that provide a sufficient basis, based on our standard of review, for the jury to conclude Martin's shooter(s) threatened him with bodily harm. These circumstances further support a conclusion that the threatening act of shooting at Harris made the taking possible.

We hold there is sufficient evidence Martin's shooter(s) threatened him with bodily harm for a rational jury to find Harris guilty beyond a reasonable doubt of aggravated robbery as charged.

## MOTION FOR MISTRIAL

Harris next argues the district court erred in denying his motion for mistrial after the prosecutor allegedly disparaged his attorney in the jury's presence. This issue arose at trial when the prosecutor asked a detective about an initial interview with Harris. Defense counsel objected, arguing the State had not notified her of any statement Harris gave to police other than a later recorded statement. The prosecutor responded to the objection by stating, "Judge, that's absolutely false." The prosecutor then began discussing an earlier *Jackson v. Denno* hearing, but the court interrupted and excused the jury, stating, "Obviously we have a matter we have to take up outside of your presence."

The prosecutor and defense counsel argued their positions regarding the initial statement after the jury left. Defense counsel did not ask for a mistrial based on the prosecutor's "that's absolutely false" comment at that time. The court could not immediately resolve the matter and called a recess to allow itself and counsel time to review the *Denno* hearing.

The next morning, the court summarized the substantive issue before it as notice that the State planned to use Harris' first state-

ment to the police against him. The court overruled defense counsel's objection to the admission of Harris' first statement. Defense counsel then notified the court she wanted to argue a motion. And although the nature of the motion was not explicitly mentioned, the record discloses it was for a finding that the State caused an intentional mistrial. The court indicated it would provide defense counsel time to argue the motion and wanted to speak with counsel in chambers before the trial recommenced. When the trial reconvened, the prosecutor told the jury:

"[Defense counsel], and ladies and gentlemen of the jury, I just wanted to make a statement to you to let you know that I apologize for making any statements yesterday that may have impugned the integrity of [defense counsel]. And I believe—I just wanted you guys to know that and I wanted Court and counsel to know that as well."

After this statement, the court thanked the prosecutor and told her to call her next witness. The court revisited the motion for mistrial near the end of the trial and found that the prosecutor's conduct did not require reversal, stating:

"Well, obviously, K.S.A. 22-3423, statute regarding mistrials, controls this particular situation. But, frankly, even more important, the fact situation controls.

"I had the court reporter review the incident and the prosecutor did make one statement in front of the jury that they heard and [defense counsel] had stood up to object to [the detective's] response to the State's inquiry as to the first contact and first statement given. She got up, she objected to this line of questioning. She indicated there's been testimony in this case that there was one recorded statement of her client taken. She indicated that that was the testimony of [a detective] at the *Denno* hearing. She indicated and gave her recollection of what [a detective] had testified to at that hearing in that his answers indicated there were no other statements taken from her client. And that based upon her reports, there's no documentation generated that there [were] any other statements taken.

"[The prosecutor] said on the record and in front of the jury, Judge, that's absolutely false. The court said, okay. [The prosecutor] said, you were here at the *Denno* hearing and, at that point, the Court interrupted both counsel, said, hang on. I indicated to the jury, obviously we have a matter we need to take up outside outside [*sic*] your presence. We're gonna take a short recess, which we did. But they left.

"So there was only one statement that the jury heard from [the prosecutor] regarding the character of counsel and that was, Judge, that's absolutely false. During the motion hearing, she did indicate and used the word liar or that's a lie, but that was not in front of the jury.

. . . .

"Based upon the context, the fact that this is a serious case and that both counsel have been zealous in representations of their respective clients, I do not find that the prosecutor's comment, first of all, was intentional or intentionally made to impugn the character of defense counsel. I felt that it was—it was, in fact, in response to what coun—your recollections, which later there was a middle road between both of your positions as far as the detective's testimony was concerned. But, frankly, the comment doesn't rise, in this Court's opinion, to intentional misconduct.

"I don't find that it's impossible to proceed with the trial without injustice to either the State or the defendant. I do not believe that one comment, Judge, that's absolutely false, rises to the level of justifying a mistrial in this case.

"Motion for mistrial will be denied because the one comment in the context of the entire trial does not substantially prejudice the criminal rights of the defendant in this case. So motion will be denied.

. . . .

"However, and I'll say this, I have been disappointed with both counsel, specifically the State. You're both seasoned attorneys. You can have differences, but you can take care of those differences in a professional manner. I expect you both to do the same—

. . . .

"And frankly, you have after that particular incident.

"Oh, and one other comment. The State did, in fact, cure in the Court's opinion, that one comment by apologizing to the jury, the Court, and [defense counsel]. And she didn't—she didn't have to do that, but I gave her the opportunity to do so and she took it. And I think if there were—if there was any prejudice, it was cured by that comment.

. . . .

". . . There's no prejudice. There will be no mistrial and we'll proceed to the reading of the instructions and closing arguments."

*Standard of Review*

Under K.S.A. 22-3423(1)(c) a trial court may declare a mistrial if prejudicial conduct, inside or outside the courtroom, makes it impossible for the trial to proceed without injustice to either the defendant or the prosecution. This statute creates a two-step analytical process. First, the trial court must determine if the proceeding suffered some fundamental failure. If so, the trial court then assesses whether it is possible to continue without an injustice. In other words, the trial court must decide if the prejudicial conduct's damaging effect can be removed or mitigated by an admonition, jury instruction, or other action. If not, it must determine

whether the degree of prejudice results in an injustice and, if so, declare a mistrial. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012); see *State v. Race*, 293 Kan. 69, 80, 259 P.3d 707 (2011).

An appellate court reviews a district court's ruling on a motion for mistrial for abuse of discretion. Judicial discretion is abused if

"judicial action (1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *Ward*, 292 Kan. at 550.

In *Ward*, our court articulated this standard by dividing the appellate court's abuse of discretion inquiry into two parts: (1) Did the district court abuse its discretion when deciding if there was a fundamental failure in the proceeding? and (2) Did the district court abuse its discretion when deciding whether the conduct caused prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice? 292 Kan. at 551. Because we conclude the district court did not err when it determined the prosecutor's comment did not constitute a fundamental failure in Harris' trial, we need not engage in the prejudice analysis.

Analyzing whether a fundamental failure occurred varies with the alleged deficiency's nature, such as whether the allegation is based on a witness' actions, a bystander's actions, prosecutorial misconduct, or an evidentiary error. 292 Kan. at 551. This case involves a motion for mistrial based upon a prosecutorial misconduct claim. Appellate review of an allegation of prosecutorial misconduct requires a two-step analysis. First, an appellate court decides whether the comments were outside the wide latitude a prosecutor is allowed, *e.g.*, in discussing the evidence. If so, there was misconduct. Second, if misconduct is found, an appellate court must determine whether the improper comments prejudiced the jury and denied the defendant a fair trial. *State v. Mireles*, 297 Kan. 339, Syl. ¶ 11, 301 P.3d 677 (2013).

*Discussion*

The first question we must answer is whether the district court abused its discretion in determining the prosecutor's response to defense counsel's objection was not a fundamental failure in the proceeding. On appeal, the State concedes the prosecutor's comment in front of the jury was "probably improper." Moreover, in the district court the prosecutor explicitly conceded her statement was improper but noted she apologized to the jury, the court, and defense counsel and told the court she was not intentionally trying to cause a mistrial.

The district court determined the prosecutor's comment did not rise to prejudicial intentional misconduct. We agree the comment did not amount to a fundamental failure in Harris' trial.

Prosecutors are generally afforded wide latitude in presenting evidence and arguing their cases. See *State v. Albright*, 283 Kan. 418, 430, 153 P.3d 497 (2007) ("We conclude that [the prosecutor's analogies for the defendant's theory of the case] were within the wide latitude given a prosecutor in discussing the evidence."); see also *State v. Richmond*, 289 Kan. 419, 442, 212 P.3d 165 (2009) (prosecutor was within wide discretion when telling defense witness "[y]ou can go back to jail").

But prosecutors may exceed this latitude and commit misconduct by, for example, commenting to the jury on facts not in evidence; asking witnesses questions not founded in law or fact; violating orders in limine; commenting on defendants' postarrest silence; and commenting on witnesses' credibility—specifically, calling defendants or defense counsel liars during arguments to the jury. See *State v. Inkelaar*, 293 Kan. 414, 429, 264 P.3d 81 (2011) (questions predicated on misstatement of law); *State v. White*, 284 Kan. 333, 340, 161 P.3d 208 (2007) (failure to notify defense of material change in expert testimony); *State v. Gleason*, 277 Kan. 624, 640-41, 88 P.3d 218 (2004) (introducing evidence excluded by order in limine); *State v. Pabst*, 268 Kan. 501, 506, 996 P.2d 321 (2000) (comment on credibility of defendant and defense counsel); *State v. Ruff*, 252 Kan. 625, 634-35, 847 P.2d 1258 (1993) (telling jury it had a duty to send a message). The State concedes

the comment here was probably improper; but that does not necessarily mean it amounted to prejudicial misconduct. See *Richmond*, 289 Kan. at 445; *White*, 284 Kan. at 340 (prosecutor did not commit misconduct when he suggested witness "practices a lot in testifying"); see also *State v. Wells*, 297 Kan. 741, 751, 305 P.3d 568 (2013) (no misconduct when prosecutor told jury in closing arguments there were "at least $3,500 worth of reasons" defendant's paid expert gave favorable testimony).

Harris argues misconduct has been found when prosecutors called defendants or defense counsel liars multiple times, or in conjunction with other objectionable conduct while making arguments and commenting upon evidence to the jury. See *Pabst*, 268 Kan. at 505-12 (prosecutor referred to defendant and his attorney as liars 11 times in closing argument); *State v. Magdaleno*, 28 Kan. App. 2d 429, 437-38, 17 P.3d 974 (prosecutor suggested in closing arguments that defense counsel lied), *rev. denied* 271 Kan. 1040 (2001); *State v. Pham*, 27 Kan. App. 2d 996, 1005-06, 10 P.3d 780 (2000) (prosecutor stated in closing arguments that defense counsel did not care about the truth, did not want the truth, and was not credible); *State v. Lockhart*, 24 Kan. App. 2d 488, 491-93, 947 P.2d 461 (prosecutor called both defendant and counsel liars in closing arguments), *rev. denied* 263 Kan. 889 (1997). But these cases are easily distinguishable.

The comment in this case did not occur during argument about the evidence to the jury. Rather, the prosecutor made the comment to the judge in response to an evidentiary objection. And it happened only once and did not include a more derogatory label such as "lie," "liar," or similar words. Moreover, the comment did not directly reflect on Harris or his attorney. It was simply the prosecutor's emphatic evaluation of the grounds upon which Harris' attorney raised an objection.

Under these facts, this isolated comment did not constitute misconduct. It was within the wide latitude afforded to prosecutors. The district court did not abuse its discretion when it concluded the comment did not constitute prejudicial misconduct. The comment did not cause a fundamental failure in Harris' trial. The district court considered that the prosecutor did not utter the com-

ment to attack defense counsel's character, but rather in response to defense counsel's objection. But see *Ward,* 292 Kan. at 576 (district court abused its discretion in denying motion for mistrial when it did not consider legal principles governing decision).

We hold the district court did not err when it denied Harris' motion for mistrial. Accordingly, we need not address the injustice prong.

## ALTERNATIVE MEANS

Harris next argues the district court instructed the jury on four alternative means of committing felony murder: that Martin was killed while Harris was (1) committing an aggravated robbery; (2) attempting to commit an aggravated robbery; (3) in flight from committing an aggravated robbery; or (4) in flight from attempting to commit an aggravated robbery. The felony-murder jury instruction in this case, which was based on K.S.A. 21-3401(b), read:

"To establish [the crime of murder in the first degree,] . . . . the following claims must be proved:

. . . .

"2. That such killing was done *while in the commission of, attempting to commit, or in flight from committing or attempting to commit an inherently dangerous felony,* to-wit: aggravated robbery. . . ." (Emphasis added.)

Harris argues the State only presented evidence the killing was done while committing a robbery and presented no evidence on the other three means the State charged (attempting to commit, in flight from committing, and in flight from attempting to commit).

We recently rejected this same argument in *State v. Cheffen,* 297 Kan. 689, 303 P.3d 1261 (2013), which involved the underlying felony of child abuse. We held:

"The felony-murder statute has two primary elements—killing and simultaneously engaging in an inherently dangerous felony. The second element can be established through proof that the killing occurred while the defendant was committing, attempting to commit, or fleeing from an inherently dangerous felony. These are simply factual circumstances in which a material element may be proven. Therefore, this language in the felony-murder statute does not create alternative means, and the State was not obligated to prove the killing was done during an attempt to commit child abuse." *Cheffen,* 297 Kan. at 702.

In *Cheffen*, the State omitted the "flight from" language in K.S.A. 21-3401(b), but we noted as a practical matter the alternative means analysis is the same for all phrases in the felony-murder statute. 297 Kan. at 700-01. For the same reasons, Harris' alternative means argument is without merit.

Affirmed.

* * *

JOHNSON, J., dissenting: I respectfully dissent from the majority's determination that the evidence was sufficient to support a conviction for the charged version of aggravated robbery. As the majority notes: "Robbery is the taking of property from the person or presence of another by force or by threat of bodily harm to any person." K.S.A. 21-3426. In other words, a robber can obtain control over the victim's property by forcibly taking it or a robber can acquire possession of the stolen property by coercing the victim to relinquish it out of the fear created by a threat to inflict bodily harm on the victim if he or she resists the taking.

I appreciate that public sentiment might lean toward punishing a person who has been proved guilty of accomplishing aggravated robbery by one method, notwithstanding that the State charged the defendant with committing the crime by another method. But the people's documents, our federal and state constitutions, have imbued a criminal defendant with the due process right to know the allegations against which he or she must defend. See, *e.g.*, *Wisner v. State*, 216 Kan. 523, 532 P.2d 1051 (1975) ("Procedural due process requires that a defendant have notice of a specific charge so that he has an opportunity to defend himself and be heard on trial of the issues raised by that charge."). And it is our duty, notwithstanding the inevitable scorn that will be visited upon us by the legally uninformed and regardless of our personal disdain for the ultimate result in a particular case, to guard and protect those constitutional rights for future generations. If not here, then where?

Here, the State chose to exclusively pursue a taking-by-threat theory of prosecution. Accordingly, the jury was instructed that one of the material elements that the State had to prove beyond a

reasonable doubt was "[t]hat the taking was by threat of bodily harm to Phillip A. Martin." Yet, the only evidence presented by the State established that the robbers searched for and took Martin's box of money only *after* all three robbers had shot him, inflicting a total of 16 bullet wounds that left Martin lying on his kitchen floor incapacitated, if not lifeless, and way past the point at which he could respond to a threat. As the majority points out, citing *State v. Deiterman*, 271 Kan. 975, 992-93, 29 P.3d 411 (2001), and *State v. Myers*, 230 Kan. 697, 703, 640 P.2d 1245 (1982), we have previously clarified that shooting a robbery victim as a prelude to taking his or her property is a taking *by force*, not a taking by threat of bodily harm. Indeed, if a robber shoots the victim, *i.e.*, actually inflicts bodily harm, one would intuit that the scenario has moved past the threat of bodily harm stage. Even if the robber verbalizes a threat to inflict *additional* bodily harm, it would be the actual infliction of the initial bodily harm that precipitated the relinquishment of property.

I parted ways with the majority early in its analysis, fundamentally disagreeing with its declaration that the "taking can occur after . . . the victim's death." I construe the "taking by threat" language of both the statute and the jury instruction as addressing causation, *i.e.*, the taking was accomplished through the use of the threat. The only way to apply that language to a post-death taking is to construe the words to mean "taking *after* a threat," even though the taking was actually effected by the forceful killing of the victim rather than *by* the threat. Putting aside the rule that we should assign common meaning to common words, I can divine no possible reason for having such a temporal rule. To the contrary, logic rejects the fallacy of *post hoc, ergo propter hoc* (after this, therefore because of this). Plainly then, I would simply say that, as a matter of law, a robber cannot take property from a dead person by threat of bodily harm.

My disagreement with the concept of post-death taking by threat leads me to also reject the majority's definition of the question presented as being "whether direct evidence supports one or more inferences that Martin was threatened with bodily harm." The issue is not whether a threat was made or implied; it is whether property

was taken through the use of a threat. For instance, the majority points to the testimony that the two initial shooters, Gibson and Blakeney, were in the house for approximately 5 minutes before the gunfire erupted, which was plenty of time for the robbers to communicate a threat or for Martin to realize he was being threatened. My response is, "So what?" Five minutes was enough time for Gibson to commit sexual battery, criminal damage to property, or any number of other crimes, but there is no *evidence* that he did so. We do not permit juries to speculate about what *might* have happened, and we should not engage in such guess work either. See *State v. Spear*, 297 Kan. 780, 790-91, 304 P.3d 1246 (Kan. 2013) (citing cases indicating a "guess" cannot prove a fact beyond a reasonable doubt). Moreover, common sense would suggest that the robbers would be loathe to compromise the element of surprise by warning an armed man of their intention to rob him.

Nevertheless, even if a threat did occur in that 5-minute time frame, it was not effective to transfer possession of Martin's property to the robbers, and the most that could be said is that there was an *attempted* aggravated robbery by threat of bodily harm. That attempt charge was not on the table. Neither was aggravated assault, rendering Martin's realization of imminent danger irrelevant. Accordingly, it matters not a whit whether Martin was facing his attackers when the first shot was fired, so long as his property did not transfer to the robbers before they forcibly took it by rendering him incapable of resisting with 16 rounds of handgun ammunition. The real question is whether any conjured-up, speculative threat "ma[d]e it possible for the defendant to take property from the victim's [presence] without resistance." *Myers*, 230 Kan. at 703. The resounding answer in this case is "no." With that answer comes reversal.

MORITZ, J., joins in the foregoing dissent.