NOT DESIGNATED FOR PUBLICATION

No. 122,314

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

KATRON HARRIS,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; J. DEXTER BURDETTE and JENNIFER L. MYERS, judges. Opinion filed September 24, 2021. Affirmed.

*Bach T. Hang*, of The Douglas Firm LLC, of Wichita, for appellant.

*Daniel G. Obermeier*, assistant district attorney, *Mark A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., ISHERWOOD, J., and MCANANY, S.J.

PER CURIAM: Katron Harris appeals the trial court's summary denial of his second K.S.A. 60-1507 motion and its denial of his motion to alter or amend that judgment. Harris claims that his trial counsel was ineffective because his counsel did not allow him to testify at his trial for felony murder and aggravated robbery. Because Harris' 60-1507 motion is successive, we affirm the trial court's denial of both of his motions.

1

Harris is serving life in prison for felony murder, in violation of K.S.A. 21-3401(b), with a consecutive 72 months' imprisonment for aggravated robbery, in violation of K.S.A. 21-3427. Our Supreme Court laid out the facts underlying Harris' convictions in *State v. Harris*, 297 Kan. 1076, 1078-81, 306 P.3d 282 (2013):

"On October 6, 2008, police officers responded to a 911 call at a home in Kansas City, Kansas. The officers found the garage door half open, the door into the house from the garage open, and [Phillip] Martin lying dead on his stomach in a small kitchen. Shell casings from two different caliber firearms surrounded Martin's body. Martin had a loaded .22 caliber semi-automatic handgun, with a bullet chambered, and $600 cash in his pants pockets. It appeared he had been cooking crack cocaine (powder cocaine mixed with baking soda and water) in the kitchen at the time he died. The kitchen faucet was running when police arrived.

"Over the course of several days detectives investigating the crime learned Harris was involved and detained him. In his first police interview, Harris said he did not know Martin, had nothing to do with the crime, and was staying at a hotel in Johnson County with his girlfriend and his mother when the killing occurred. The detectives ended the interview, booked Harris, and placed him on a 48-hour hold. The next evening detectives interviewed Harris again. This time, Harris changed his story.

"He told detectives he met Kelvin Gibson, Jr., the night of the killing. He and Gibson took a walk and met Demarcus Blakeney. Harris said the three men walked to Martin's house and Gibson went inside. Gibson came out and said he was going to rob Martin. Harris said he did not believe Gibson and did not want to rob anyone, so he stood across the street. Gibson instructed Harris to let him and Blakeney know if Harris heard anything. Gibson and Blakeney went into the house.

"Harris said he heard approximately 12 gunshots in quick succession after about 5 minutes. He said Blakeney ran out, handed Harris a gun, and told Harris he had to go into the house and 'put in [his] work' so that he would not 'snitch' on them. Harris said he entered the house and saw Martin lying motionless on the floor. Gibson then told Harris to shoot Martin, which Harris did one time. Harris said Gibson went through the house

2

because he knew where Martin's things were, and got a box of money. The three then ran. Harris said Gibson gave him $100.

"The State charged Harris with felony murder with aggravated robbery as the underlying felony, and with aggravated robbery by threat of bodily harm.

"At trial, the State established that Martin sold drugs out of his home. When customers came to buy drugs, they entered through the garage and often were met by a doorman. If there was no doorman, customers knocked on the door. Martin put his proceeds in two shoeboxes. The State presented testimony that 2 days before the murder one shoebox contained $1,900 and the other one contained $3,200. At the crime scene, police found only one shoebox with approximately $2,000. The State also established Gibson was often at Martin's home and ran errands for Martin in exchange for money, gas, and marijuana.

"Christina Woody testified she bought marijuana from Martin at 8:45 p.m. on the night of Martin's death. When she entered Martin's house, a man she did not know but later identified as Gibson was sitting on the living room couch. Martin was cooking crack cocaine in his kitchen. After purchasing the marijuana, Woody left.

"Brian Houston, Martin's friend, also testified. Houston spent time with Martin nearly every day. He said he called Martin a little after 9 p.m. on the night of the killing, but the call went straight to Martin's voicemail. Houston said he went to Martin's house around 9:30 p.m., exited his car, and saw Gibson wandering around outside. Houston said it was strange that Gibson's car was not at Martin's house. Houston walked up and Gibson gestured for him to come toward the garage. As Houston ducked under the garage door, Gibson stood between Houston and the door to the house and told Houston, '[A]in't nothing going on right now.' Houston testified Gibson usually said something like this when Martin was conducting drug business. Houston also noticed Gibson was very fidgety and that Martin's house was unusually quiet because normally Martin played videos and talked on the phone. Houston left without going inside. Houston continued to call Martin until 11 p.m. but never got an answer.

"Martin's sister, Angela Martin, testified she spoke with Martin for 3 to 4 minutes by phone at 10 p.m. She heard several male voices in the house, but nothing struck her as out of the ordinary during the conversation.

"Martin's neighbor from down the street testified she heard three gunshots the night Martin was murdered. She said it sounded like the shots came from a vacant house

3

next door. She looked out the window. About 4 or 5 minutes after the shots she saw three black men running down the street. Each wore a black hooded sweatshirt and black pants.

"Daneasha Connor testified she found Martin dead at approximately 9 p.m. and called police. Conner concluded Martin knew his killer because he did not usually allow others in the house while cooking drugs and would not turn his back to someone he did not know. Conner also testified she took a gun from Martin's back pocket. She believed Martin trusted the person in his home because he did not use the guns he carried.

"An investigating detective testified there was no forced entry into the house and that Martin was shot multiple times. The detective thought Martin was comfortable with the perpetrator(s) being in his home. He also testified Gibson provided Harris' and Blakeney's names to police.

"Dr. Erik Mitchell performed Martin's autopsy. He concluded Martin died from gunshot wounds primarily due to blood loss. Mitchell testified Martin had 16 gunshot wounds from at least two weapons, although he could not ascertain the order in which the wounds were inflicted. He concluded none were immediately fatal. He said Martin had a gunshot wound to his foot, an entry wound on the back side of his left leg indicating the shooter was behind him, an entry wound on the back of his right thigh also indicating the shooter was behind him, an entry wound to his left hip with a direction of travel indicating the shooter was behind him, an entry wound on the back of his left forearm, nine entry wounds to his back, and two entry wounds to his front torso.

"The State argued Harris either actively participated in the crimes or aided and abetted Gibson and Blakeney in committing them. The jury found Harris guilty of felony murder and aggravated robbery. The district court imposed consecutive terms of life and 72 months' imprisonment, with lifetime postrelease supervision. Harris timely appealed."

Harris did not testify at trial or call any witnesses on his behalf. Harris did not object to the proposed jury instructions.

On direct appeal, Harris argued: (1) The State presented insufficient evidence to prove that the aggravated robbery was done by threat of bodily harm; (2) the trial court abused its discretion when it denied Harris' request for a mistrial; and (3) the phrase "in the commission of, attempt to commit, or flight from an inherently dangerous felony"

4

created alternative means of committing the crime and the State failed to provide sufficient evidence to support each means. Our Supreme Court affirmed Harris' convictions. 297 Kan. at 1091. The mandate issued on September 9, 2013.

In 2014, Harris filed a pro se K.S.A. 60-1507 motion. He argued that his trial counsel was ineffective because she: (1) failed to object that his second statement to police resulted from a violation of Harris' Fifth Amendment rights under the United States Constitution and was therefore inadmissible; (2) failed to challenge Harris' first statement to police as an involuntary confession and inadmissible; and (3) called no witnesses on Harris' behalf. The trial court summarily denied Harris' 60-1507 motion, and this court affirmed. *Harris v. State*, No. 114,159, 2016 WL 2775580 (Kan. App. 2016) (unpublished opinion).

This appeal arises from Harris' second pro se 60-1507 motion. In his pro se motion, Harris alleged that (1) there was insufficient evidence to support his convictions, (2) the trial court empaneled disqualified jurors, (3) the trial court improperly handled a jury question, (4) the prosecution erred, (5) his statements to police were inadmissible because police lacked probable cause to arrest him, (6) the admission of his statements to police violated his Fifth and Sixth Amendment rights, (7) the trial court erred in instructing the jury, (8) the trial court failed to "complete the verdict," (9) his trial counsel was ineffective, (10) his direct appeal counsel was ineffective, and (11) his first 60-1507 counsel was ineffective.

With this second 60-1507 motion, Harris included an affidavit which asserted that he had been hanging out with Gibson and Blakeney on the evening of October 6, 2008. Harris explains that Gibson and Blakeney decided that they had to "hit a lick" to get some money. Harris admits that he understood the phrase "hit a lick" meant stealing money, but he claims he did not know any further details. Blakeney, Gibson, and Harris went to Martin's house so that Gibson could get marijuana. Harris stated that he waited outside

because he did not know Martin, and Brian Tatum approached and spoke with Harris while Harris was waiting. While Harris talked with Tatum, Gibson came back from the house and said that he and Blakeney planned to rob Martin, asking Harris to keep an eye out. When Harris said no, Gibson went back to the house. But Harris assumed that Gibson had given up on the plan to rob Martin because Harris refused to be a lookout. Soon after, Harris and Tatum heard gunshots and ran off. Harris claims that Gibson and Blakeney caught up with him several hours later and paid him $100 to keep his mouth shut.

In his affidavit, Harris explained that the first time he spoke with police, he said that he knew nothing about the murder because he was at a hotel that night with other people. When police questioned him a second time, Harris says that they began by telling him what they believed happened. Harris states that in the recorded interview he recited back the story the police had told him, hoping the police would be satisfied and would release him. Harris explains that police pressure was his motivation for saying he was involved in the robbery and for saying he was forced to shoot Martin's body to incriminate himself. Harris' affidavit also asserted that his trial counsel refused to call a potentially exculpatory witness and that his trial counsel prevented Harris from testifying on his behalf.

The State responded to Harris' motion, saying the motion was successive and Harris' claims were barred by res judicata.

The trial court summarily denied Harris' 60-1507 motion as successive and conclusory. Harris moved to alter or amend the judgment. The trial court denied Harris' motion to amend, finding that his claims were res judicata or successive and that he failed to show exceptional circumstances.

Harris timely appeals.

ANALYSIS

Harris argues that the trial court erred by denying his K.S.A. 60-1507 motion without first holding an evidentiary hearing. He claims that his affidavit adequately alleged facts which, if true, would entitle him to relief. His affidavit stated that his trial counsel deprived him of the right to testify. Thus, Harris argues that the trial court should have held an evidentiary hearing before ruling on his 60-1507 motion.

*Standard of Review*

A trial court has three options when handling a K.S.A. 60-1507 motion:

> "'(1) The court may determine that the motion, files, and case records conclusively show the prisoner is entitled to no relief and deny the motion summarily; (2) the court may determine from the motion, files, and records that a potentially substantial issue exists, in which case a preliminary hearing may be held. If the court then determines there is no substantial issue, the court may deny the motion; or (3) the court may determine from the motion, files, records, or preliminary hearing that a substantial issue is presented requiring a full hearing.' [Citations omitted.]" *White v. State*, 308 Kan. 491, 504, 421 P.3d 718 (2018).

The standard of review depends on which of these options the trial court used. 308 Kan. at 504.

When the trial court summarily dismisses a K.S.A. 60-1507 motion, an appellate court conducts a de novo review to determine whether the motion, files, and records of the case conclusively establish that the movant is not entitled to relief. *Beauclair v. State*, 308 Kan. 284, 293, 419 P.3d 1180 (2018).

To be entitled to relief under K.S.A. 60-1507, the movant must establish by a preponderance of the evidence either: (1) "the judgment was rendered without jurisdiction"; (2) "the sentence imposed was not authorized by law or is otherwise open to collateral attack"; or (3) "there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack." K.S.A. 2020 Supp. 60-1507(b); see Supreme Court Rule 183(g) (2021 Kan. S. Ct. R. 239).

To avoid the summary denial of a motion brought under K.S.A. 60-1507, a movant bears the burden of establishing entitlement to an evidentiary hearing. To meet this burden, a movant's contentions must be more than conclusory, and either the movant must set forth an evidentiary basis to support those contentions or the basis must be evident from the record. If such a showing is made, the court must hold a hearing unless the motion is a "'second'" or "'successive'" motion seeking similar relief. *Sola-Morales v. State*, 300 Kan. 875, 881, 335 P.3d 1162 (2014) (quoting *Holmes v. State*, 292 Kan. 271, 274, 252 P.3d 573 [2011]); see also *Littlejohn v. State*, 310 Kan. 439, Syl., 447 P.3d 375 (2019) ("An inmate filing a second or successive motion under K.S.A. 60-1507 must show exceptional circumstances to avoid having the motion dismissed as an abuse of remedy.").

The trial court shall hold an evidentiary hearing on a K.S.A. 60-1507 motion and make findings of fact and conclusions of law, unless the motion and the files and records of the case conclusively show the movant is not entitled to relief. K.S.A. 2020 Supp. 60-1507(b); Supreme Court Rule 183(f) and (j).

Supreme Court Rule 183(c)(3) (2021 Kan. S. Ct. R. 239) provides:

"A proceeding under K.S.A. 60-1507 ordinarily may not be used as a substitute for direct appeal involving mere trial errors or as a substitute for a second appeal. Mere

8

trial errors must be corrected by direct appeal, but trial errors affecting constitutional rights may be raised even though the error could have been raised on appeal, provided exceptional circumstances excuse the failure to appeal."

Under K.S.A. 60-1507(c), a sentencing court need not entertain a second or successive motion for similar relief on behalf of the same prisoner. *Beauclair*, 308 Kan. at 304. "A movant in a K.S.A. 60-1507 motion is presumed to have listed all grounds for relief, and a subsequent motion need not be considered in the absence of a showing of circumstances justifying the original failure to list a ground." *State v. Trotter*, 296 Kan. 898, Syl. ¶ 2, 295 P.3d 1039 (2013).

To avoid a dismissal of a second or successive K.S.A. 60-1507 motion, the movant bears the burden of establishing exceptional circumstances. Exceptional circumstances are unusual events or intervening changes in the law that prevented the defendant from raising the issue in a prior K.S.A. 60-1507 motion. *Beauclair*, 308 Kan. at 304. Exceptional circumstances can include ineffective assistance of counsel claims and a colorable claim of actual innocence based on the crime victim's recantation of testimony that formed the basis of the charge against the defendant. See 308 Kan. at 304 (treating a colorable claim of actual innocence as an exceptional circumstance); *Rowland v. State*, 289 Kan. 1076, 1087, 219 P.3d 1212 (2009) (allowing an ineffective assistance of counsel claim in a first 60-1507 motion when the issue had not been raised on direct appeal).

On appeal, Harris correctly conceded that his motion "contains issues which will not and cannot be raised here in this brief." He limits his arguments to those not decided either on direct appeal or in his first 60-1507 motion. He argues that the trial court erred in summarily denying his 60-1507 motion without an evidentiary hearing. Harris contends his claim that his trial counsel prevented him from testifying is not conclusory

and that this claim merits an evidentiary hearing. He further asserts that the trial court erred by dismissing the claim as res judicata.

The State responds that Harris' current 60-1507 motion is untimely, successive, and barred by res judicata. The State further asserts that Harris' current motion lacks merit because he cannot show he was prejudiced by any deficiency in his trial counsel's performance.

Here, the trial court did not review whether Harris' motion should be dismissed as untimely. Thus, we will not address the issue of untimeliness. But if a trial court reaches the correct result, its decision will be upheld even though it relied on the wrong ground or assigned erroneous reasons for its decision. See *State v. Overman*, 301 Kan. 704, 712, 348 P.3d 516 (2015).

Harris here claims actual innocence. Our Supreme Court has recognized two types of actual innocence claims. *Beauclair*, 308 Kan. at 297-301. The first type is a claim that the movant is actually innocent despite a fair and error-free trial leading to a finding of guilt. See *Herrera v. Collins*, 506 U.S. 390, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993). The second type is a claim that constitutional errors deprived the jury of critical evidence which would have established the movant's innocence. See *Beauclair*, 308 Kan. at 298-300 (quoting *Schlup v. Delo*, 513 U.S. 298, 314-16, 115 S. Ct. 851, 130 L. Ed. 2d 808 [1995]).

Harris presents a claim of actual innocence of this second type. He contends that he was denied the fundamental right to testify on his behalf at trial. He claims that he was never informed he had a right to testify and that it was his sole decision to make.

In this respect, Harris' case resembles *Beauclair*, but with crucial differences. Danny E. Beauclair pleaded no contest to rape of a child under 14 years of age and

aggravated criminal sodomy of a child under 14 years of age. After an unsuccessful direct appeal and several collateral attacks seeking relief, Beauclair filed a 60-1507 motion with 22 attached affidavits and declarations from the victim and others recanting the accusations against Beauclair. Beauclair acknowledged that he had confessed to his crimes but explained that his confession was untrue and provided an explanation for why he made the statement to police. On appeal, this court determined that Beauclair's affidavits did not sufficiently advance a colorable claim of actual innocence compared to his confession and later testimony. 308 Kan. at 291-92. On review, our Supreme Court disagreed, stating that this court disregarded the affidavits and declarations and remanded to the trial court for an evidentiary hearing. 308 Kan. at 304-05. Here, Harris' affidavit also explains that he made an untruthful confession to police because he thought police would release him if he did.

Harris argues, just as Beauclair did, that the statements he makes in his 60-1507 motion should be taken as true at this stage of the proceedings. But the *Beauclair* court rejected this argument. The *Beauclair* court reiterated that the standard is whether "'the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.'" 308 Kan. at 302. The *Beauclair* court then criticized this court for disregarding the affidavits and declarations that Beauclair provided with his 60-1507 motion. 302 Kan. at 302-03.

Here, we do not have 22 affidavits and declarations recanting accusations against the movant. Harris' own affidavit is the sole attachment to the motion, and our Supreme Court specifically rejected "the movant's word alone." 308 Kan. at 302.

*Harris' current 60-1507 motion is successive*

K.S.A. 2020 Supp. 60-1507(c) and Supreme Court Rule 183(d) provide that a trial court need not entertain successive motions on behalf of the same prisoner. This rule

11

prohibiting successive motions, however, is subject to limited exceptions. *Thuko v. State*, 310 Kan. 74, 84, 444 P.3d 927 (2019). To avoid having a second or successive K.S.A. 60-1507 motion dismissed, the movant must establish exceptional circumstances. "Exceptional circumstances" are defined as unusual events or intervening changes in the law that prevented the movant from raising the issues in the preceding 60-1507 motion. *Beauclair*, 308 Kan. at 304.

Harris' claims exceptional circumstances which do not advance his case. In his brief, he describes the importance of the fundamental right to testify, claims that he did not waive his right to testify, and claims that he was never informed he had a right to testify. He concludes by stating: "If true, this certainly would qualify as an exceptional circumstance and also a manifest injustice." But Harris misunderstands the definition and context of exceptional circumstances.

An exceptional circumstance arising from a change in the law occurred in *Williams v. State*, 58 Kan. App. 2d 947, 476 P.3d 805 (2020). Ronell Williams killed two people in 1999, when he was 14 years old. In 2004, our Supreme Court affirmed his convictions and sentences for two first-degree murders, aggravated robbery, and aggravated battery. *State v. Williams*, 277 Kan. 338, 85 P.3d 697 (2004). Then, in 2012, the United States Supreme Court held that the Eighth Amendment to the United States Constitution prohibits a mandatory sentencing scheme including life in prison without parole for a juvenile homicide offender if the sentencing process does not give the sentencing court discretion to consider the offender's youth and characteristics at sentencing. *Miller v. Alabama*, 567 U.S. 460, 480, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). Williams filed his second 60-1057 motion, arguing that *Miller* was a change in the law and created an exceptional circumstance allowing review. This court agreed. *Williams*, 58 Kan. App. 2d at 952-53.

Harris fails to show an exceptional circumstance. *Williams* shows an exceptional circumstance created by a change in the law. The victim's recanted testimony in *Beauclair* serves as an example of an unusual event which presents facts or evidence not previously available. Harris makes no attempt to argue for new law that he could not have raised in his preceding 60-1507 motion. He similarly provides no unusual event which produced facts that he could not have presented in his preceding 60-1507 motion.

Harris knew by the end of trial if his counsel had barred him from testifying. Notably, in his pro se 60-1507 motion to the trial court here, he complained that his counsel on his first pro se 60-1507 motion did not do enough. Harris did not raise the issue himself in his first 60-1507 motion. But he contends that his previous 60-1507 counsel should have reviewed his case record and, from that record, spotted and raised additional issues beyond what Harris could raise as a layperson inmate. But Harris' affidavit about the conversation where his trial counsel told him not to testify suggests that this conversation happened off the record, as would be appropriate for attorney-client discussions. His counsel on his first 60-1507 motion would not have known about the conversation no matter how diligently counsel reviewed the record. Thus, the issue is one that only Harris could have raised in his first pro se 60-1507 motion, and he did not. In his brief, Harris argues only that a defendant not informed of his right to testify would be an exceptional circumstance in a trial setting. But he offers no explanation for why he failed to raise that issue in his first pro se 60-1507 motion. Thus, his successive 60-1507 motion should not be considered because no exceptional circumstances warrant its consideration.

For similar reasons, Harris' claim is barred by res judicata. Where an appeal is taken from a conviction or sentence imposed, the judgment of the appellate court is res judicata as to all issues actually raised. Issues that could have been raised are deemed waived. *State v. Salary*, 309 Kan. 479, 482, 437 P.3d 953 (2019) (citing *State v. Kingsley*, 299 Kan. 896, 901, 326 P.3d 1083 [2014]); see also *State v. Martin*, 294 Kan. 638, 640-

41, 279 P.3d 704 (2012) (issues raised and decided in prior 60-1507 motions or motions to correct an illegal sentence are res judicata and cannot be raised in subsequent motions). Harris could have raised the issue that his trial counsel prohibited him from testifying in his previous 60-1507 motion, but he did not. *Harris*, 2016 WL 2775580. He is precluded from raising the issue now.

Finally, if we were to address Harris' claim on the merits, his claim would fail to show prejudice.

> "To prevail on a claim of ineffective assistance of trial counsel, a criminal defendant must establish (1) that the performance of defense counsel was deficient under the totality of the circumstances, and (2) prejudice, i.e., that there is a reasonable probability the jury would have reached a different result absent the deficient performance. *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014) (relying on *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 [1984])." *Salary*, 309 Kan. at 483.

Harris fails to argue that there is a reasonable probability that the jury would have reached a different result, instead focusing on the denial of a due process right. He contends that the trial court should have reached the merits of his claim to determine if a reasonable probability existed that the outcome of trial would have been different.

But Harris' evidentiary support differs significantly from the 22 affidavits and declarations in *Beauclair*. Harris argues that his own testimony should have been presented to the jury beside his recorded statements to police. His first statement to police was that he was not present at Martin's house but was at a hotel with his girlfriend and his mother. His second statement to police was that he did not participate in the robbery but was coerced into firing a shot into Martin's body after the fact. He now argues that his trial testimony would have been that he was waiting outside the house, ran when he heard gunshots, and was later paid $100 to keep quiet.

14

For witnesses to be believed, their accounts as to what happened must be consistent. Harris offers no plausible explanation for the contradictions in his three separate accounts about what he was doing when Martin was being shot 16 times. His lack of consistency results in his downfall. Thus, Harris fails to show a reasonable probability that the jury would have credited his third account of the events to arrive at a not guilty verdict.

For the preceding reasons, we affirm.

Affirmed.