No. 105,384

STATE OF KANSAS, *Appellee*, v. ANDERSON CHEFFEN, *Appellant*.

(303 P.3d 1261)

Opinion filed June 21, 2013.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause, and *Matthew J. Edge*, of the same office, was on the brief for appellant.

*Sheryl L. Lidtke*, chief deputy district attorney, argued the cause, and *Jerome A. Gorman*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: Anderson Cheffen directly appeals his first-degree felony-murder conviction, which was based on the underlying felony of child abuse, following the death of his girlfriend's 10-month-old son. Cheffen argues that (1) the trial court violated his right to a unanimous verdict because it asked individual jurors before the verdict was read whether it was their verdict—rather than asking after the verdict was read; (2) the phrase "in the commission of, attempt to commit, or flight from an inherently dangerous felony" in the felony-murder statute creates alternative means of committing the crime; and (3) he was entitled to a lesser included offense instruction on intentional second-degree murder. We affirm his conviction because the jury polling issue was not preserved, the language cited in the felony-murder statute does not create alternative means, and the failure to give a second-degree murder instruction was harmless.

## FACTUAL AND PROCEDURAL BACKGROUND

On the morning of June 17, 2009, Cheffen took his girlfriend, Brandy Wiseman, to work around 7:15 a.m. Wiseman's 10-month-

old son, Kawliga, and her 4-year-old son were in the car. Cheffen took care of the children during the day while Wiseman worked.

Wiseman testified at trial that she changed Kawliga's diaper that morning and there were no new bruises or marks on him at that time. She said he was wearing a white onesie and drank his bottle on the way to work. Cheffen testified he was the one who got the children ready that morning and gave Kawliga a bottle to drink while they took Wiseman to work. He said Kawliga was wearing a gray and red onesie.

Cheffen said he stopped at a few places before returning home that afternoon. He testified that he took Kawliga's clothes off, made another bottle, and laid Kawliga in his crib. But Cheffen later testified that the child was still wearing the red and gray onesie when put in his crib. Cheffen testified he went to wake Kawliga around 2:30 p.m. but the boy "didn't have no life to him so I kind of panicked." Cheffen said he ran to the kitchen and rubbed water through Kawliga's hair and on the back of his neck. When Kawliga did not respond, Cheffen tried to call Wiseman but could not reach her. He testified that he punched two holes in the bedroom wall when she did not answer. When she finally answered a fourth call, Cheffen told Wiseman that Kawliga was not responding. He testified Wiseman instructed him to come get her.

Wiseman disputed this point at trial. She testified that Cheffen called her around 2:30 p.m., sounding panicky. When Cheffen told her Kawliga was unresponsive, she told him to call 911 and go to a hospital but Cheffen insisted on picking her up first.

Cheffen testified that when he left Wiseman's house he tried to put Kawliga in a car seat but he kept slumping over, so he sat Kawliga in his lap. He later laid him on the front seat next to him. When he got to Wiseman's work, Wiseman was waiting. When Cheffen drove up, Wiseman testified that he handed her Kawliga and that the child's "eyes were only half open, but he wasn't blinking or moving them." Kawliga also was not breathing, so Wiseman tried CPR while they drove to Overland Park Regional Medical Center.

Dr. Richard Rosenthal, the emergency room physician who treated Kawliga, testified this was a "very severe case that we don't

see that often." He observed that Kawliga was not breathing and remained limp even after inserting a breathing tube. He testified Kawliga had fresh abrasions to the left side of his forehead; fresh bruising to the right and left ears; a "fairly large" hematoma on the back right side of his head; bruising on the front of his neck; and some fresh and some old bruising on his legs and back. Rosenthal concluded that Kawliga had a serious head injury, the hematoma was caused by a blow to that spot, and the lack of oxygen for whatever period of time was life-threatening. Kawliga was quickly transferred to Children's Mercy Hospital.

At Children's Mercy, Kawliga was treated by Dr. Laura Plummer, a pediatric ophthalmologist and adult strabismus surgeon. She testified that she was asked to examine Kawliga given the nature of his injuries and a concern that this was a nonaccidental trauma because shaken baby syndrome often includes eye damage. She observed that Kawliga suffered very severe neurologic damage as evidenced by the fact that his eyes were fixed and dilated and would not respond to light. She testified this was evidence of impending brain death or very serious brain injury. Kawliga had diffuse retinal hemorrhaging of the eye.

Dr. Bradley Vaughan, a specialist in pediatric critical care, testified that Kawliga was comatose and had a skull fracture on the right side of his head with significant brain swelling. The child also had a subdural hematoma, which commonly results in an altered mental state and could stop breathing. Vaughan testified that Kawliga also had broken ribs, which could be caused by squeezing the child's chest. Vaughan concluded Kawliga's injuries were caused by a significant traumatic impact to the head requiring a forceful blow to the skull, which would be atypical for a fall from 3 feet off a bed onto the floor as Cheffen had claimed. He also told the jury it would be difficult to demonstrate with just a fist the kind of necessary force needed to inflict these injuries because it would require the child being accelerated and hitting a firm surface or stationary object. Vaughn suspected that Kawliga immediately lost consciousness on impact given the degree of swelling present on a CT scan. Vaughan concluded that Kawliga's injuries were intentionally inflicted and constituted child abuse.

Kawliga died 3 days after arriving at the hospital. An autopsy was performed by Dr. Altaf Hossain, who confirmed at trial that Kawliga had a right-side skull fracture and a subdural hematoma. The boy also had bruising on the head, left side of the face, chin, and neck. Hossain testified that the most likely cause of Kawliga's bruises, contusions, and abrasions to the face was punching or forceful hitting, but he conceded that it was possible for such injuries to be caused by falling on the floor. Hossain also said bruising on Kawliga's right ear could result from punching or slamming the baby's head against a wall and that mere slapping probably would not have caused the injury.

Hossain further testified that Kawliga had bruising around his neck that was consistent with somebody having their hands around his neck but was inconsistent with choking. He noted several of Kawliga's ribs were broken and that some were "acute" or recent injuries, while others were healing and, therefore, older. Hossain agreed with Vaughan's testimony that Kawliga would have lost consciousness immediately upon impact and that it was possible he would have had respiratory difficulty. He also said it was difficult to establish a date for these injuries but that Kawliga would have been immediately unconscious and would have stayed that way if he did not receive medical treatment. Hossain concluded the injuries constituted battered child syndrome.

Police investigators discovered a white onesie with blood stains around the collar intertwined in the comforter on Wiseman's bed. The blood matched Kawliga's DNA profile. Blood found on Cheffen's T-shirt and shorts also matched Kawliga's DNA profile.

Three holes also were found in Wiseman's bedroom wall. The bed is a few inches from that wall. When describing how high the holes were on the wall, the 5'10" investigating officer testified they were higher than him and he had to "reach up a little bit" to get to the holes even if kneeling on the bed. He estimated the holes were less than a foot from the ceiling. Sheetrock or plaster was collected from the largest hole and tested for skin cells or touch DNA that can be transferred through contact with an object. The DNA swabs from the wall pieces were consistent with a mixture of at least two individuals, and the major component was consistent

with Kawliga's DNA profile. The officer said that if part of Kawliga's body had struck the sheetrock, it could have left enough skin cells to generate the DNA profile, but it was also possible Kawliga's DNA got onto the wall through a secondary transfer, such as if the police did not change their gloves after touching Kawliga's onesie or if Cheffen punched the hole after touching Kawliga.

Cheffen admitted Kawliga did not stop breathing or become unconscious until he was in Cheffen's sole custody. But Cheffen testified that he did not throw or swing Kawliga at the wall, and he did not shake him. He testified that while in the park that morning Kawliga rolled over a ball and scraped his head on a cover Cheffen had placed on the grass. He also testified that Kawliga had fallen off the bed and hit his head on a stereo a week earlier. Cheffen testified that was the last day Kawliga was wearing the white onesie.

Wiseman testified that the previous week Kawliga had a mushy knot on the right side of his head above his ear along the hairline. Both Wiseman and Cheffen testified that Kawliga was acting normal. The stereo was swabbed for DNA, and it was consistent with a mixture of DNA from at least two people. Kawliga's DNA profile was consistent with the main component.

At the conclusion of the evidence, the jury was instructed on first-degree felony murder based upon the underlying felony of child abuse. No lesser included offense instructions were requested or issued. One instruction informed the jury that its "agreement upon a verdict must be unanimous." The jury convicted Cheffen of first-degree felony murder.

Before the verdict was read, the trial judge confirmed that Juror 34 had been elected presiding juror and asked whether the jury had reached a verdict. The presiding juror stated, "We have." The trial judge then asked the remaining jurors, "So say you all?" and the jury collectively responded "yes." The bailiff then read the jury's guilty verdict. After that, the district court asked if either party had any motions to offer, and the attorneys responded in the negative. The court dismissed the jury.

Cheffen was sentenced to life imprisonment with a mandatory minimum of 20 years. He filed a timely notice of appeal to this court, which has jurisdiction under K.S.A. 22-3601 (life sentence).

## K.S.A. 22-3421 JURY POLLING PROCEDURE

A criminal defendant has a statutory right to a unanimous jury verdict. See K.S.A. 22-3421; K.S.A. 22-3423(1)(d); *State v. Wright*, 290 Kan. 194, 201, 224 P.3d 1159 (2010) ("Jury unanimity on guilt in a criminal case is statutorily required in Kansas."). Cheffen claims that right was violated because the district court did not follow the K.S.A. 22-3421 procedure for polling the jury. That statute provides:

"The verdict shall be written, signed by the presiding juror and read by the clerk to the jury, and the inquiry made whether it is the jury's verdict. If any juror disagrees, the jury must be sent out again; but if no disagreement is expressed and neither party requires the jury to be polled, the verdict is complete and the jury discharged from the case. If the verdict is defective in form only, it may be corrected by the court, with the assent of the jury, before it is discharged."

As can be seen from its text, K.S.A. 22-3421 sets out two inquiries that the trial court must make. The first is that the trial judge must ask whether the verdict read in open court is the jury's verdict after that verdict is read. This is evident from the statute's first sentence, which establishes the process for accepting the verdict and is structured in a chronological order: (1) the jury writes a verdict; (2) the verdict is signed by the presiding juror; (3) the clerk reads the verdict; and then (4) the court inquires whether it is the jury's verdict. The second requirement is that the trial judge must poll the jurors individually—if either party requests it. See *State v. Dunlap*, 46 Kan. App. 2d 924, 928, 266 P.3d 1242 (2011), *petition for rev. filed* December 30, 2011; *State v. Stangl*, No. 105,400, 2012 WL 924831 (Kan. App. 2012) (unpublished opinion), *petition for rev. filed* April 11, 2012.

Cheffen challenges two aspects of the trial court's conformance with K.S.A. 22-3421. First, Cheffen notes the trial judge asked if it was the jury's verdict *before* it was read rather than *after* it was read. Second, he argues the district court should have *sua sponte* individually polled the jurors. Cheffen admits he is raising these issues for the first time on appeal. He also articulates no circumstances from his trial that create uncertainty in the verdict that was announced. We consider first whether his challenges to the jury

polling procedures were preserved for appeal. We conclude that they were not.

*Preservation of the jury polling issues*

Cheffen asks this court to invoke two of the three recognized exceptions allowing consideration of an issue raised for the first time on appeal. See *State v. McCullough*, 293 Kan. 970, 998, 270 P.3d 1142 (2012) (reciting three exceptions to the general rule that a new legal theory cannot be asserted for the first time on appeal). Cheffen argues his challenges (1) involve "the fundamental right to a unanimous jury verdict" and (2) are questions of law and do not rely on disputed facts. Cheffen cites to *State v. Puckett*, 230 Kan. 596, 640 P.2d 1198 (1982), as support for his request that we invoke these exceptions. But *Puckett* does not deal with jury polling and stands only for the general proposition that an appellate court has the authority to invoke an exception for raising an issue on appeal under the specified circumstances. 230 Kan. at 598-99.

The State disagrees that jury polling challenges may be considered for the first time on appeal, citing without elaboration our decision in *State v. Holt*, 285 Kan. 760, 175 P.3d 239 (2008), which is more on point. In *Holt*, the district court individually polled jurors upon the request of defense counsel. But on appeal Holt argued for the first time that the district court incorrectly worded the inquiry by asking each juror, " 'Is this the verdict of the jury?' " instead of asking whether it was that juror's individual verdict. 285 Kan. at 766. This court refused to address the challenge because the defendant failed to object to the form of the question when it was asked by the trial court. 285 Kan. at 767, 769-70.

In so holding, the *Holt* court wrote a broadly worded syllabus paragraph, stating: "The rule that a party cannot raise an issue on appeal where no contemporaneous objection was made at trial and where the trial court did not have an opportunity to rule applies to jury polling requests under K.S.A. 22-3421." 285 Kan. 760, Syl. ¶ 3. The *Holt* court also rejected the defendant's request to invoke an "ends of justice" exception to this general rule, noting there was nothing in the record to suggest the verdict was less than unanimous or compromised by partiality. And, the court continued, the

jury was instructed it had to arrive at a unanimous verdict. 285 Kan. at 770. Several Court of Appeals decisions have grafted *Holt's* contemporaneous objection requirement to other K.S.A. 22-3421 claims that are similar to Cheffen's. See *State v.Capps,* 105,653, 2012 WL 5973917, at *5 (Kan. App. 2012) (unpublished opinion), *petition for rev. filed* December 21, 2012; *State v. Martin,* 105,564, 2012 WL 2148177, at *2 (Kan. App. 2012) (unpublished opinion), *petition for rev. filed* July 9, 2012.

But the issue raised in *Holt* is distinguishable from Cheffen's claim. In *Holt,* the jurors were individually polled but there was a question whether the words used in performing that function were proper. As the *Holt* court noted, these circumstances were very much akin to the contemporaneous objection rule associated with K.S.A. 60-404 and K.S.A. 22-3420(3), so the case was disposed of based on that analogy. 285 Kan. at 768. Cheffen instead claims we should consider his jury polling challenge for the first time on appeal because it involves a "fundamental right to a unanimous jury verdict." This exception, however, is inapplicable. The right to a unanimous jury verdict is not constitutional—it is statutory. See K.S.A. 22-3423(1)(d); *Holt,* 285 Kan. at 766; *State v. Voyles,* 284 Kan. 239, 250-51, 160 P.3d 794 (2007). Similarly, the right to request a jury poll of individual jurors is not constitutional. *Holt,* 285 Kan. at 767; see K.S.A. 22-3421.

Cheffen notes that one panel of the Court of Appeals has characterized the purpose of K.S.A. 22-3421 as ensuring a defendant's "constitutional right to a unanimous verdict" *State v. Gray,* 45 Kan. App. 2d 522, 524, 249 P.3d 465, *rev. denied* 292 Kan. 967 (2011). In *Gray,* the district court failed to ask the jury whether the verdict announced was its verdict. The panel held the district court erred by not inquiring whether it was the jury's verdict and that this failure prevented the verdict from being complete. The panel then held this error required reversal and granted a new trial because "to hold otherwise would ignore the importance of the requirements of unanimity and finality with respect to jury verdicts." 45 Kan. App. 2d at 525.

Notably, there was nothing in the record to raise concerns about the *Gray* verdict's unanimity, but the panel dismissed this distinc-

tion, stating that K.S.A. 22-3421 requires compliance even when the parties waive polling to "ensure a defendant's *constitutional* right to a right to a unanimous verdict and to safeguard the concept of finality with respect to the jury verdict." (Emphasis added.) 45 Kan. App. 2d at 524. Put simply, *Gray* would ignore any preservation issues and find structural error requiring reversal without requiring evidence the defendant suffered prejudice from the error.

But other Court of Appeals panels have pointed out *Gray's* error in asserting a constitutional basis for its analysis and imposing a structural error approach. See, *e.g.*, *Dunlap*, 46 Kan. App. 2d at 936. We agree those portions of *Gray* are erroneous, are now overruled, and have no force or effect as precedent. Similarly, we reject an exception to the rule that an issue may not be considered for the first time on appeal on the basis that a challenge such as this presents only questions of law and does not rely on disputed facts. At the very least, the prejudice analysis requires factual review.

We hold that the better rule is to require a party wishing to challenge the trial court's compliance with the procedures set out in K.S.A. 22-3421 for inquiring about a jury's verdict to have raised that issue first with the district court either in the form of a contemporaneous objection or posttrial motion. Our holding in *Holt* adopting the contemporaneous objection rule when the form of the court's inquiry is challenged remains good law.

But Cheffen's K.S.A. 22-3421 claims are distinguishable. And requiring that an issue be raised to the trial court, but not necessarily imposing a contemporaneous objection requirement in all instances, recognizes circumstances may arise postverdict when a party learns facts that raise a question of whether the jury was truly unanimous. See, *e.g.*, *State v. Johnson*, 40 Kan. App. 2d 1059, 198 P.3d 769 (2008) (through posttrial motion for new trial, defendant presented two juror affidavits indicating verdict was incorrect and not truly unanimous in challenging trial court's lack of inquiry as required by K.S.A. 22-3421). Allowing a party to raise this issue in a posttrial motion provides the trial court an opportunity to entertain any factual inquires regarding whether unanimity is in doubt.

Because no objection was raised below and no posttrial motion was filed, we hold that Cheffen failed to preserve his K.S.A. 22-3421 challenge for appellate court consideration.

### ALTERNATIVE MEANS

In *State v. Timley*, 255 Kan. 286, 289, 875 P.2d 242 (1994), this court adopted what is referred to as the "alternative means rule," or its corollary "super-sufficiency requirement," stating:

" '[W]here a single offense may be committed in more than one way, there must be jury unanimity as to guilt for the single crime charged. Unanimity is not required, however, as to the means by which the crime was committed so long as substantial evidence supports each alternative means. [Citations omitted.]' " 255 Kan. at 289.

Cheffen argues the felony-murder jury instruction, which is based on K.S.A. 21-3401(b), presented alternative means of committing the underlying felony because it instructed the jury to determine whether Kawliga was killed while Cheffen was in the commission of, or attempting to commit, child abuse. He argues his right to a unanimous jury verdict was violated because the State did not present sufficient evidence of an attempt to commit child abuse. Whether the language "in the commission of, attempt to commit, or flight from an inherently dangerous felony" creates an alternative means is an issue of first impression for this court.

Cheffen admits he is raising this issue for the first time on appeal, but argues it can be reviewed anyway because his fundamental right to a unanimous jury verdict is implicated. The State does not dispute this point; it addresses the merits of Cheffen's claim without addressing whether this issue is preserved. And although the State's failure to argue preservation could raise a question as to whether the State waived it, we note that alternative means issues have been addressed for the first time on appeal because they implicate whether there is sufficient evidence to support the conviction. *State v. Shaw*, 47 Kan. App. 2d 994, 1000, 281 P.3d 576 (2012), *petition for rev. filed* August 10, 2012; *State v. Rivera*, 42 Kan. App. 2d 914, 918, 218 P.3d 457 (2009), *rev. denied* 290 Kan. 1102 (2010); see also *State v. Farmer*, 285 Kan. 541, 545, 175 P.3d 221 (2008) ("There is no requirement that a criminal defendant

challenge the sufficiency of the evidence before the trial court in order to preserve it for appeal.").

We will address the merits of Cheffen's alternative means argument for this reason, even though it is raised for the first time on appeal. But the first question is whether we are presented with an alternative means issue. We hold that we are not.

*Standard of Review*

In *State v. Brown*, 295 Kan. 181, 189-200, 290 P.3d 629 (2012), this court held that a determination of whether a statute provides alternative means of committing a crime is governed by legislative intent and established guidelines for ascertaining that intent. "Issues of statutory interpretation and construction, including issues of whether a statute creates alternative means, raise questions of law reviewable de novo on appeal." 295 Kan. at 193-94. The following framework now governs the alternative means analysis:

"In examining legislative intent, a court must determine for each statute what the legislature's use of a disjunctive 'or' is intended to accomplish. Is it to list alternative distinct, material elements of a crime—that is, the necessary *mens rea*, *actus reus*, and, in some statutes, a causation element? Or is it to merely describe a material element or a factual circumstance that would prove the crime? The listing of alternative distinct, material elements, when incorporated into an elements instruction, creates an alternative means issue demanding super-sufficiency of the evidence. But merely describing a material element or a factual circumstance that would prove the crime does not create alternative means, even if the description is included in a jury instruction. [Citation omitted.]" 295 Kan. at 194.

*Discussion*

Cheffen was charged with felony murder under K.S.A. 21-3401(b). It provides:

"Murder in the first degree is the killing of a human being committed:

. . . .

"(b) in the commission of, attempt to commit, or flight from an inherently dangerous felony as defined in K.S.A. 21-3436 . . . ." K.S.A. 21-3401(b).

The jury instruction issued in Cheffen's case omitted the "flight from" language in the third phrase and simply instructed the jury to determine whether Kawliga was killed while Cheffen was (1) in the commission of child abuse or (2) attempting to commit child abuse. Cheffen's argument appropriately frames the issue narrowly

based on the facts in his case, but as a practical matter the alternative means analysis is the same for all three phrases in the felony-murder statute.

At the outset it is worth distinguishing the issue raised by Cheffen from a different felony-murder alternative means issue examined by this court in *State v. Bailey*, 292 Kan. 449, 255 P.3d 19 (2011). In *Bailey*, the defendant was charged with felony murder based on the underlying felonies of aggravated burglary or robbery. This court held that *"different underlying felonies* supporting a charge of felony murder are alternative means rather than multiple acts." (Emphasis added.) 292 Kan. at 458. *Bailey* is different because Cheffen was only charged with one underlying felony—child abuse. And his claim is based on the statutory language "in the commission of, attempt to commit, or flight from" that child abuse.

Cheffen's argument is very similar to alternative means arguments made in our recent decisions considering the driving under the influence (DUI) and aggravated intimidation of a witness statutes. See *State v. Ahrens*, 296 Kan. 151, 290 P.3d 629 (2012) (DUI); *State v. Aguirre*, 296 Kan. 99, 290 P.3d 612 (2012) (aggravated intimidation of a witness).

In *Ahrens*, the defendant was convicted of DUI under K.S.A. 2008 Supp. 8-1567(a), which stated "no person *shall operate or attempt to operate* any vehicle while" meeting any of the enumerated conditions which establish the person was under the influence of drugs or alcohol. (Emphasis added.) This court held that the legislature did not intend to create alternative means of committing DUI "by placing the disjunctive 'or' between the term 'operate' and the phrase 'attempt to operate . . . .'" 296 Kan. at 160. We held there were two primary elements to the crime—driving and simultaneously being under the influence. The terms "operate" and "attempt to operate" were merely different factual circumstances that could prove the material element of driving. 296 Kan. at 161.

In *Aguirre*, the defendant was convicted of aggravated intimidation of a victim in violation of K.S.A. 21-3833, which defined intimidation of a witness or victim as "knowingly and maliciously preventing or dissuading or attempting to prevent or dissuade" that person from reporting the victimization. This court held that those

possibilities are not alternative means because the statute prohibits only one type of conduct—the act of intimidating the witness or victim. Whether the defendant was successful or merely attempted to intimidate was immaterial. 296 Kan. at 106-07. A similar analysis can be applied to the felony-murder statute.

The felony-murder statute has two primary elements—killing and simultaneously engaging in an inherently dangerous felony. The second element can be established through proof that the killing occurred while the defendant was committing, attempting to commit, or fleeing from an inherently dangerous felony. These are simply factual circumstances in which a material element may be proven. Therefore, this language in the felony-murder statute does not create alternative means, and the State was not obligated to prove the killing was done during an attempt to commit child abuse.

## Lesser Included Offense Instruction

Cheffen argues he was entitled to a jury instruction on intentional second-degree murder because the intent to kill could be inferred from the severity of Kawliga's injuries. He bases his argument on caselaw holding that intent may be inferred from the nature of the victim's injuries in some circumstances. Cheffen did not request any lesser included offense instructions at trial but now claims the failure to issue them was clearly erroneous.

At the outset, we note some ambiguity as to what instructions are at issue. In an issue heading in his appellate brief, Cheffen claims entitlement to instructions as to both second-degree intentional murder and voluntary manslaughter. But he only addresses second-degree intentional murder in his analysis. And he does not mention or argue why he is entitled to a voluntary manslaughter instruction. An issue mentioned in passing but not argued is deemed abandoned. *State v. Holman*, 295 Kan. 116, 139, 284 P.3d 251 (2012). The only issue we will consider is whether Cheffen was entitled to an instruction on second-degree intentional murder.

*Standard of Review*

Because Cheffen did not object to the district court's failure to give a second-degree intentional murder instruction, we base our review on K.S.A. 22-3414(3) and the stair-step analytical process set out in our recent decisions in *State v. Herbel,* 296 Kan. 1101, Syl. ¶¶ 7-8, 299 P.3d 292 (2013), and *State v. Williams,* 295 Kan. 506, 511, 286 P.3d 195 (2012). As *Williams* articulated, K.S.A. 22-3413(3) creates a procedural hurdle when a party fails to object because the statute establishes a preservation rule for instruction claims on appeal. It provides, in part, that no party may assign as error a district court's failure to give a particular jury instruction, including a lesser included crime instruction, unless the failure to give that instruction is clearly erroneous. If it is clearly erroneous, appellate review is not predicated upon an objection in the district court. *Williams,* 295 Kan. at 512-13.

To establish that the failure to give an instruction was clearly erroneous, the reviewing court must determine whether there was any error at all. This requires demonstrating that giving the instruction would have been both legally and factually appropriate, employing an unlimited review of the entire record. *Williams,* 295 Kan. at 515-16. And if error is found on that basis, then the court moves to a reversibility inquiry in which it assesses whether it is firmly convinced the jury would have reached a different verdict had the instruction been given. The defendant maintains the burden to establish the degree of prejudice necessary for reversal. 295 Kan. at 516.

*Discussion*

A second-degree murder instruction is legally appropriate because at the time this crime was committed second-degree murder under K.S.A. 21-3402 was a lesser included offense of felony murder. *State v. Calvin,* 279 Kan. 193, 202, 105 P.3d 710 (2005); but see K.S.A. 2012 Supp. 21-5109(b)(1) (there are no lesser degrees to felony murder effective July 1, 2012). The next question is whether the instruction was factually appropriate in this case.

K.S.A. 21-3402 defines second-degree intentional murder as the killing of a human being committed intentionally. It is a specific

intent crime requiring the defendant to have the specific intent to kill. *State v. Deal*, 293 Kan. 872, 883, 269 P.3d 1282 (2012). The statute focuses culpability on whether the killing is intentional, not whether a deliberate and voluntary act leads to death. 293 Kan. at 885.

Cheffen argues the intentional second-degree murder instruction was factually appropriate because his intent to kill may be inferred from the fact that Kawliga died from a subdural hematoma he received with a skull fracture. Without citation to the record, Cheffen argues "[t]here was evidence that this type of injury is almost always intentional." And he makes this argument even though it is inconsistent with the defense he offered at trial that he did not harm the child. He contends the failure to give the second-degree instruction was "clearly erroneous" given the extensive nature of Kawliga's injuries.

The State argues the second-degree murder instruction would be factually inappropriate because there was no evidence presented "about the defendant's state of mind as related to the child's life or death." It claims Cheffen confuses the evidence of the intentional act resulting in Kawliga's injuries with the intent to kill him. The State is correct that the proper inquiry focuses on whether Cheffen intended to kill Kawliga. See *Deal*, 293 Kan. at 883. But the State's argument overlooks Cheffen's claim that intent to kill can be inferred from acts, circumstances, and inferences reasonably deducible therefrom. See *State v. Barnes*, 293 Kan. 240, 264, 262 P.3d 297 (2011).

Our caselaw supports Cheffen's argument that intent may be inferred from the nature of Kawliga's injuries. Cheffen punched Kawliga in the head, swung him against a wall, or inflicted other injuries, causing a skull fracture and a subdural hematoma. And Cheffen drove past a hospital to pick up Wiseman while Kawliga lay unresponsive and not breathing on the seat next to him. The trial court had an obligation to instruct on this lesser included offense because the evidence was sufficient to require it. *State v. Simmons*, 295 Kan. 171, 177, 283 P.3d 212 (2012). We consider next whether this amounts to clear error.

Given the overwhelming evidence against Cheffen, the failure to issue the instruction was not clear error. He admits Kawliga was in his sole custody when the child lost consciousness. And at least two physicians testified Kawliga's injuries would have caused an immediate loss of consciousness. We are firmly convinced the jury would not have reached a different verdict had the instruction been given.

The judgment of the district court is affirmed.

\* \* \*

ROSEN, J., concurring: I agree with the majority's decision to affirm the judgment of the district court. I agree that Cheffen failed to preserve for appellate review the issue of whether the district court complied with K.S.A. 22-3421. I also agree that the phrase "in the commission of, attempt to commit, or flight from an inherently dangerous felony" found in K.S.A. 21-3401(b) does not establish alternative means of committing felony murder. Finally, I agree that Cheffen is not entitled to a new trial based on the district court judge's failure to instruct the jury on second-degree murder. However, consistent with my dissenting opinions in *State v. Qualls*, 297 Kan. 61, 73-75, 298 P.3d 311, (2013); *State v. Haberlein*, 296 Kan. 195, 213-14, 290 P.3d 640 (2012), *State v. Tahah*, 293 Kan. 267, 280-84, 262 P.3d 1045 (2011), and *State v. Scaife*, 286 Kan. 614, 627-31, 186 P.3d 755 (2008), I do not agree with the analysis the majority employs to reach this final conclusion—namely, its conclusion that though the district court judge erred when he failed to instruct the jury on the lesser included offense of second-degree murder, this failure does not constitute reversible error.

In contrast to the majority's analysis, I would simply find that due to the overwhelming evidence presented at trial establishing Cheffen's guilt for felony murder based on his act of committing child abuse resulting in the death of Kawliga, an instruction on second-degree murder would not have been factually appropriate in this case. This analysis is consistent with the test set forth in K.S.A. 22-3414(3), which requires a district court judge who has heard, seen, and evaluated all of the evidence in a criminal case to

determine whether there is "some evidence which would *reasonably justify a conviction*" of the lesser included crime. (Emphasis added.) Because the State presented overwhelming evidence that Cheffen committed felony murder, a conviction for second-degree murder—based solely on inferences taken from the injuries Kawliga sustained from being abused—would not have been reasonably justified. The majority's opinion in this case and its opinions in the cases cited above establish a standard where in reality a district court judge has no option but to automatically instruct the jury on all lesser included offenses, regardless of whether the instructions are requested and in spite of the actual evidence. As I have opined in my previous dissents on this issue, that has never been the law and should not become the law of this state.

MORITZ, J., joins the foregoing concurring opinion.