NOT DESIGNATED FOR PUBLICATION

No. 115,193

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MICHAEL PAUL DARNELL,
*Appellant*.

MEMORANDUM OPINION

Appeal from Saline District Court; RENE S. YOUNG, judge. Opinion filed October 27, 2017. Affirmed.

*Caroline M. Zuschek*, of Kansas Appellate Defender Office, for appellant.

*Anna Jumpponen*, assistant county attorney, *Ellen Mitchell*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before STANDRIDGE, P.J., HILL and SCHROEDER, JJ.

PER CURIAM: Michael Paul Darnell asks us to reverse his convictions for several serious crimes he committed during his attack on a woman in Salina. We have found no reversible errors and affirm his convictions. Additionally, the court's order directing him to pay for witness fees is proper and will not be modified by this court.

*The case begins with a home invasion.*

The victim in this case, T.W., woke up in the early morning to the sound of her dog barking. She lived in Salina. A man she did not recognize was standing at her front door. He had a ball cap pulled down and his face turned away. When T.W. opened the door, the man hit her in the face. She fell to the floor, and the man repeatedly pushed her face into the floor with his hands. Her nose began to bleed. She screamed and the man told her to shut up. The man asked if anyone else was home. T.W. said that she had a roommate. The man then drug T.W. by her neck and hair from the foyer to her roommate's bedroom, but she was not home. The man then became upset and accused T.W. of lying. At some point, the man got some tissues for T.W. to stop the bleeding from her nose because he did not want to get blood on him.

The man then took T.W. into the living room, stood her up against him, and put her in a choke hold. At this point, the man pressed her body against his, while he used his other hand to touch her breasts and buttocks. She was shaking from fear. The man told T.W. to stop shaking, but she could not stop, which made the man more upset. T.W. felt something hard against her body. Later she stated that she did not know whether the man had a weapon or an erection.

The man asked her several times for her name and age. The man told her his name was Mike. She smelled alcohol on him. He told T.W. he wanted money. He told her that times were hard and she was better off than he was. T.W. offered him $60 cash, a debit card, and a check, but he refused to take it.

In what proved to be a brilliant tactic, T.W. asked the man if they could smoke a cigarette outside since her roommate did not permit smoking in the house. She handed the man two cigarettes and they went out on the porch. The man still held T.W. by her neck. But when the man handed her a cigarette, T.W. broke away and, barefoot, ran down

2

the block, screaming. When she saw a car, she flagged it down and jumped in. Using the driver's cell phone to call 911, she told the dispatcher that she had been attacked by a drunk man.

T.W. was injured during this confrontation. She had swelling, bruising, and soreness on her neck and face. Her legs were bruised and she had cuts and blisters on her feet. When she talked to the police, she recalled the man had a tattoo with the name "Kaiden" or "Aidan" on his hand. He wore jeans, a long-sleeved shirt, white tennis shoes, and a baseball cap. She told an officer that as soon as the man entered her home, he asked her for money. T.W. also pointed out a vehicle parked "kind of badly" in front of her house that she did not recognize. Salina Police Officer Randy Constantino noticed the car was illegally parked and sought computer information about the registration plates on the car. The car was registered to Darnell. Additionally, Constantino searched for and then found a picture of Darnell on his mobile computer.

A few moments later, Constantino saw Darnell walking about two blocks from T.W.'s house. The officer believed Darnell was highly intoxicated. He arrested Darnell and took him to the police station. The KBI laboratory later confirmed that there was blood on Darnell's shirt and shoes. DNA from the blood found on his shirt and on his shoes matched T.W.'s DNA. Darnell has "Kaiden" tattooed on his thumb. Raising no issue about committing the home invasion and his attack at trial, Darnell focused on his intoxication.

*The trial.*

The State charged Darnell with aggravated burglary, battery, aggravated kidnapping, attempted aggravated robbery, and aggravated sexual battery. At trial, T.W. identified Darnell as her attacker. Darnell did not seriously contest that he was the man

3

who had committed the acts. Instead, for his defense, he contended that he was so intoxicated that he could not form the requisite intent to commit the crimes.

In support of this defense, Darnell's live-in girlfriend at the time, Ashton Jordan, testified. Jordan testified that on the day of the attack, Darnell found out his employer had no work for him the rest of the week. So he started drinking in the afternoon. He drank a partial liter of rum. At some time before 10 p.m., the two went to the liquor store and bought another bottle of rum. They argued about money into the early morning of the next day. Darnell continued to drink, without eating or sleeping. At 4:21 a.m., Darnell called the police and said if they did not come arrest him, he was "going to kill this bitch." Then he threw the phone against the wall, shattering the phone. Darnell then left the house with the bottle of rum and a kitchen knife.

In rebuttal, Susan Williamson testified that she was at Darnell and Jordan's residence on that evening until early morning. After she left, she received a call from Jordan saying that Darnell was yelling at her and she was scared. She asked Williamson to come get her. When Williamson returned to the residence, she heard Jordan and Darnell arguing and yelling. She saw Darnell turn over a card table, shove Jordan into the kitchen, and call 911.

The police dispatcher sent Officer Michael Kohman to Darnell and Jordan's residence. Darnell was not there. Jordan told Officer Kohman that she had an argument with Darnell over money. Jordan testified at trial that she was not concerned for her safety because "Mike would never hurt me" and he never had. Jordan testified that Darnell never laid a hand on her in an angry manner in the three years they were together.

Darnell testified at trial that he started drinking around 5 or 6 p.m. He recalled getting into an argument with Jordan over money. He recalled leaving to cool down. The

4

next thing he remembered was a police officer telling him to "get down." He testified he blacked out everything in between.

Over the State's objection, the defense called a forensic toxicologist, Dr. John Vasiliades, to testify. Vasiliades estimated Darnell's blood alcohol concentration was 0.6 percent at 7 a.m. on the morning in question. He testified that at that level, a person would be dead.

The court instructed the jury on the charged crimes and also gave a voluntary intoxication instruction. The jury convicted Darnell of aggravated burglary, battery, aggravated kidnapping, and aggravated sexual battery. The jury acquitted Darnell of attempted aggravated robbery.

The court sentenced Darnell to a 285-month prison sentence. The court ordered Darnell to pay restitution and $1,295.98 to the Saline County Attorney's Office.

*We now examine Darnell's claim of the sufficiency of the evidence.*

The first issue that arises is a question of sufficiency of the evidence. Without objection, the trial court instructed the jury that to establish the charge of aggravated burglary, the State had to prove that Darnell entered or remained in a residence "with the intent to commit an aggravated robbery *or* aggravated sexual battery therein." (Emphasis added.) In other words, the State had to show evidence that he intended to commit a sexual battery and an aggravated robbery.

Here, Darnell argues that there was insufficient evidence to convict him of one of the alternative means of committing aggravated burglary—aggravated robbery. While Darnell admits that he is raising this issue for the first time on appeal, he contends that we can consider it anyway because it is a question of the sufficiency of the evidence. Our

5

Supreme Court has reviewed alternative means issues for the first time on appeal "because they implicate whether there is sufficient evidence to support the conviction." *State v. Cheffen*, 297 Kan. 689, 699, 303 P.3d 1261 (2013). We will consider the issue.

When the sufficiency of evidence is challenged in a criminal case, this court reviews the evidence in the light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. *State v. McClelland*, 301 Kan. 815, 820, 347 P.3d 211 (2015). Darnell admits that there was sufficient evidence that he entered T.W.'s residence with the intent to sexually assault her. He contends, however, that there was *no evidence* that he entered the residence with the intent to rob her. Darnell notes that he even refused to take T.W.'s money and that the jury acquitted him of attempted aggravated robbery. We look now at the evidence of robbery.

Aggravated robbery is knowingly taking property from the person or presence of another by force or by threat of bodily harm to any person when committed by a person who inflicts bodily harm upon any person in the course of such robbery. K.S.A. 2013 Supp. 21-5420. Our review of the record reveals that there was sufficient circumstantial evidence for a rational fact-finder to conclude that Darnell entered T.W.'s residence with the intent to rob her.

Darnell hit T.W. in the face as soon as she opened the door. T.W. testified that Darnell said he wanted money. Darnell told her that times were hard and she was better off than he was. T.W. offered him $60 in cash, a debit card, and a check, but he refused to take it. Officer James Miller testified that T.W. reported to him that as soon as Darnell entered her home, he asked her for money. Darnell and his girlfriend had a heated argument about money the previous night and into the early morning just before Darnell committed these crimes. The fact that Darnell did not complete a robbery does not

6

diminish the strong circumstantial evidence of his intent when he entered T.W.'s residence.

Our view does not change just because the jury did not convict Darnell of attempted aggravated robbery. There are many reasons for a jury's verdict, and it is useless to speculate about the reasons for an acquittal. It is important to note here that to convict Darnell of attempted aggravated robbery, the jury needed to agree that Darnell performed an "overt act" toward the commission of the aggravated robbery in addition to having the intent to commit aggravated robbery. We can see where a jury, based on this evidence, could find Darnell guilty of aggravated burglary and not guilty of attempted aggravated robbery.

Evidence of a defendant's intent can be, and most often is, supported entirely by circumstantial evidence. See *State v. Thach*, 305 Kan. 72, 82-84, 378 P.3d 522 (2016). The circumstantial evidence in this case supports the idea of an intent to rob when Darnell forced his way into the victim's apartment.

Legally, when a single offense may be committed in more than one way, the jury must be unanimous about the defendant's guilt. But unanimity is not required on each individual means so long as substantial evidence supports each means. *State v. Sasser*, 305 Kan. 1231, ¶ 4, 391 P.3d 698 (2017). There are two ways in which Darnell's alternative means argument could fail:

- If the two felony options in the aggravated burglary instruction are not alternative means of committing the offense; or
- if sufficient evidence supported each alternative. See *Sasser*, 305 Kan. at 1239-40.

7

The two options were alternative means, so we look to the second point. Since there was sufficient evidence supporting each alternative here, Darnell's argument fails.

*We next examine the claimed error of admission of Darnell's prior conviction.*

For his next issue, Darnell claims that the court erred by admitting evidence of his prior conviction for domestic battery. During his direct testimony, Darnell asserted that the thought that he committed these crimes made him "very sick" because he is "not that person" and had a daughter of his own. When asked on cross-examination if he was concerned whether his argument with his girlfriend, Jordan, was going to become physical, Darnell testified that he had never been physical with Jordan or any female.

Thinking an opening in the defense had just been revealed, the prosecutor asked for a meeting at the bench:

> "[THE STATE]: Judge, I think the defendant opened the door again, himself, in his
> conversation—in his testimony. And I believe that, in Atchison, on June 17th, 2012, he
> struck his girlfriend, [T.S.], and—
> "[THE DEFENDANT]: I got charged for it.
> "[THE STATE]: And he slapped her across the face. And I believe that was witnessed by
> Ashton Jordan as well. And I believe he was convicted of it, and that's on his criminal
> history record. He has a criminal threat, domestic battery.
> "[THE DEFENSE]: Well, Judge, that's an improper record to be admitted. I mean, she
> can cross him, but I'm going to object if she tries to—[Defendant interrupts].
> . . . .
> "[THE STATE]: I'm not going to admit the police report. I just showed it to [defense
> counsel] to show, but I think it's a fair question to ask him if he was, had ever slapped his
> girlfriend, [T.S.], when they lived in Atchison, based on his testimony.
> "[THE COURT]: Okay.
> "[THE DEFENSE]: I don't disagree that she can ask that.
> "[THE COURT]: Okay. Thank you."

The State then asked Darnell if he had slapped a former girlfriend. Darnell responded, "I was accused of it." The State asked if he was arrested for it and Darnell responded that he was. The State asked if Darnell was convicted of it. Darnell responded that he pled no contest because he had been drinking and did not know if he had done it. He later found out that he did not do it.

This issue was not preserved for appellate review. The defense only objected to "an improper record" to be admitted. The defense did not object on the basis of K.S.A. 60-455, which governs the limitations applicable to evidence of prior crimes, or K.S.A. 60-421, which governs the limitations on evidence of prior convictions for impeachment purposes.

The defense even agreed that the prosecutor could cross-examine Darnell about the prior incident. The defense's statement "but I'm going to object if she tries to" was interrupted by Darnell. The State understood the defense's objection to be about admitting the police report. The defense had an opportunity to correct this understanding, but instead agreed that the State could ask its question, effectively withdrawing its objection before the court had ruled on the objection.

Our statute, K.S.A. 60-404, precludes an appellate court from reviewing an evidentiary challenge in the absence of a timely and specific objection made on the record. *State v. Dupree*, 304 Kan. 43, 62, 371 P.3d 862 (2016); see *State v. King*, 288 Kan. 333, 341-42, 204 P.3d 585 (2009).

But even if we did consider this question on the merits, it is clear that Darnell ignores his statement he made on cross-examination that gave rise to the State's questions. Unsolicited, Darnell said, "I've never been physical with [Jordan]. I've never been physical with any female." Darnell argues in his brief that the prior crime evidence would be relevant to impeach him "if he stated he'd never before committed any crimes,

9

or never before committed a crime against a woman." But that is precisely what Darnell said—that he had not been physical with any woman.

While Darnell is correct that the trial court did not conduct an analysis under K.S.A. 60-455 or K.S.A. 60-421 before admitting the prior crime evidence, the bench discussion was cut off by Darnell's agreement that the State could ask its question. Darnell's failure to object prevents our appellate review.

*The trial court did not err by giving no limiting instruction.*

Tied in with the prior issue about Darnell's conviction for domestic battery is a question about the court not giving a limiting instruction about this evidence. Darnell contends that the trial court clearly erred by failing to give a limiting instruction regarding the prior crime evidence. Darnell did not request a limiting instruction and none was given. During the jury instruction conference, the court asked if there were additional instructions requested by Darnell and the defense attorney responded, "No."

Indeed, a defendant can challenge the lack of a limiting instruction for prior crimes evidence even if the defendant did not object to the admission of the other crimes evidence at trial. But the failure to object raises the persuasive burden on appeal. The defendant must convince the appellate court that the failure to give the instruction was clearly erroneous. *State v. Breeden*, 297 Kan. 567, 580-81, 304 P.3d 660 (2013).

In evaluating whether the failure to give an instruction rises to the level of clear error, we consider the entire record. *State v. Betancourt*, 299 Kan. 131, 135, 322 P.3d 353 (2014). To establish clear error, the defendant must firmly convince the appellate court that the giving of the instruction would have made a difference in the verdict. *State v. Cooper*, 303 Kan. 764, 771, 366 P.3d 232 (2016).

10

The trial court's failure to give a limiting instruction was likely erroneous under the holding in *State v. Gunby*, 282 Kan. 39, 58, 144 P.3d 647 (2006). In that case, the court held that the trial court must give a limiting instruction for prior crimes evidence to avoid error. But, in *Gunby*, it was not clearly erroneous because there was no real possibility that the jury would have rendered a different verdict. That is the case here. The evidence was primarily admitted to question the credibility of Darnell's assertion that he had never "been physical with any female."

Darnell contends the lack of limiting instruction was clearly erroneous because the jury may have assumed that because he had committed similar crimes against women in the past, he intentionally committed the charged crime or that he deserved to be convicted because he had a history of crimes against women.

However, one incident of slapping a former girlfriend is not similar to the home invasion crimes that were committed here to a perfect stranger. Darnell's prior crime does not point specifically to the propensity to commit the charged crimes. There is no reasonable possibility that the jury would have considered the former incident as sufficient to show that Darnell committed the crimes of aggravated burglary, aggravated kidnapping, and aggravated sexual battery—the intent crimes. This was not a case where identity was questioned. The only real issue at trial was whether Darnell had the intent to commit those crimes given his state of intoxication.

There was substantial evidence that Darnell acted with intent. He drove a car over to T.W.'s home. While standing at the door, he had his ball cap pulled down over his face, which was turned away. Once inside, he continuously held T.W. so she could not get away. He assessed the situation with an eye toward completing his crimes. He asked T.W. if someone else was home. He did not want to get caught. He told T.W. to stop screaming. He gave T.W. tissue to clean up her bleeding nose. He told her that he did not want to get her blood on him. He asked T.W. for money. He had just argued with his

11

girlfriend about money all night. Darnell was coherent and had coordination. In closing, the State did not argue that Darnell had a propensity to commit these crimes because of the prior crime, but instead, was effective in pointing out all of the evidence of intent.

*We find no reversible error in the prosecutor's comments.*

Darnell claims the prosecutor committed reversible error by making improper comments during closing arguments and objections. Darnell did not object at trial to most of the comments at issue.

In *State v. Sherman*, 305 Kan. 88, Syl. ¶¶ 7-8, 378 P.3d 1060 (2016), our Supreme Court gave us instructions for evaluating challenges based on the behavior of prosecutors. In *Sherman*, the court replaced the term "prosecutorial misconduct" with the term "prosecutorial error." The *Sherman* framework consists of two steps: we determine how flagrant the comments were and if they were out of bounds; then, in the second step we decide if they prejudiced the defendant. Following these instructions, we will now examine the comments of this prosecutor.

Darnell first claims the prosecutor erred by commenting on the credibility of his expert witness. The prosecutor, during closing argument, stated, "He had a hard time answering questions directly. He had omissions, nothing he wanted to tell you. He didn't answer questions yes or no. He ran with what he wanted you to hear."

Without a doubt, prosecutors may not offer their personal opinions about the credibility of witnesses. *State v. Pabst*, 268 Kan. 501, 506, 996 P.2d 321 (2000). The reason is that expressions of personal opinion by a prosecutor are a form of unsworn and unchecked testimony. *State v. Hall*, 292 Kan. 841, 852, 257 P.3d 272 (2011). The jury must be left to draw the ultimate conclusion on witness credibility. *State v. Hart*, 297 Kan. 494, 505-06, 301 P.3d 1279 (2013).

12

But prosecutors have wide latitude to tell the jury what to look for to assess witness credibility and to ask the jury to draw reasonable inferences from the evidence. *State v. Chanthaseng*, 293 Kan. 140, 148, 261 P.3d 889 (2011); *State v. McReynolds*, 288 Kan. 318, 325, 202 P.3d 658 (2009). It is not error for a prosecutor to encourage the jury to conclude from a witness' demeanor that the witness was truthful. *State v. Knox*, 301 Kan. 671, 686, 347 P.3d 656 (2015). The prosecutor's comments must be viewed in context, not in isolation. See *State v. Stone*, 291 Kan. 13, 19-20, 237 P.3d 1229 (2010).

Descriptions can be fair comment. In *State v. Albright*, 283 Kan. 418, 430-31, 153 P.3d 497 (2007), the court held that a prosecutor's characterization of the defense's expert witness as "evasive" and "antagonistic" was not outside the wide latitude afforded to prosecutors. Rather, the prosecutor "merely described witness demeanor, which is an observation not a judgment on credibility." 283 Kan. at 431. The court noted that the defense attorney in closing agreed the expert was "cantankerous" and even the judge said, outside the presence of the jury, "it would be nice if [the expert would] just answer a question." 283 Kan. at 431.

Darnell admits that the prosecutor's comments of "He had a hard time answering questions directly" and "He didn't answer questions yes or no" were permissible observations on demeanor. But he contends that the comments of, "He had omissions, nothing he wanted to tell you," and, "He ran with what he wanted you to hear," were impermissible.

We have our doubts about that assertion. Like *Albright*, the prosecutor's comments here on the expert witness' answers to questions were legitimate observations on witness demeanor. Some context is helpful. On several occasions the defense's expert did not answer the questions asked. The expert attempted to give his opinion before he was qualified as an expert. The judge admonished the defense attorney to control his witness. The judge admonished the expert witness *five times* to answer only the question that was

13

asked. The judge admonished the expert witness that if the question called for a yes or no answer, to only answer yes or no. In closing, the defense attorney commented that the expert "may not be the best communicator."

The prosecutor's comment, "He ran with what he wanted you to hear," came directly after the prosecutor stated, "He didn't answer questions yes or no," which was true. Given that the expert witness was admonished many times for not answering the question asked, it is a fair comment on this witness' demeanor.

With regard to stating the expert witness had "omissions," the prosecutor went into a discussion about all of the unknown variables and assumptions that the expert needed to make to determine Darnell's blood alcohol concentration at the time of the crimes. In context, the comment does not fall outside the wide latitude afforded to prosecutors. It was a comment on the evidence presented by the witness. This is not reversible error.

Next, Darnell claims the prosecutor erred during closing argument by stating that Darnell's defense was not valid. The prosecutor stated, "Ladies and gentlemen, voluntary intoxication is not a valid defense in this case, because the defendant was not intoxicated to the point that he couldn't form the intent to commit the crimes." Darnell primarily complains that the prosecutor did not state "the evidence shows" that voluntary intoxication is not a valid defense.

As we have said, it is improper for a prosecutor to express his or her personal opinion regarding the ultimate guilt or innocence of the defendant. *State v. Brown*, 295 Kan. 181, 212, 284 P.3d 977 (2012). But a prosecutor can make a "directional" statement as an opening to the prosecutor's summation of the evidence. *State v. De La Torre*, 300 Kan. 591, 612, 331 P.3d 815 (2014).

Immediately preceding the comment in question, the prosecutor discussed the

14

evidence showing that Darnell had formed the intent to commit his crimes. The prosecutor said, "[B]eing intoxicated is not sufficient alone. Being unable to remember what happened is not sufficient alone." The prosecutor then referred to evidence that showed Darnell was thinking rationally, assessing, and planning, was physically coordinated and coherent, recalled some of the events, and was able to drive. The prosecutor then concluded her discussion of intent with, "Ladies and gentlemen, voluntary intoxication is not a valid defense in this case, because the defendant was not intoxicated to the point that he couldn't form the intent to commit the crimes." The prosecutor's comment was a conclusion to her summation of the evidence. The comment was not improper in the context of the argument that preceded it. This, too, is not reversible error.

For his next contention, Darnell claims the prosecutor erred by misstating the facts during closing argument when discussing the defense's expert witness testimony. The prosecutor stated, "[L]adies and gentlemen, recall his testimony, that in all his years of experience and all the times he's testified he had never been called upon to testify in the manner that he did yesterday."

Darnell did object to this statement at trial: "I don't think that is the evidence. I think her questions related to if he did that in Kansas." The prosecutor responded, "You can review. If I'm incorrect, I'm sorry. You can ask and review, if that's not your recollection of the testimony." The prosecutor continued, and the court did not rule on the objection.

In closing arguments, a prosecutor may comment on the evidence as long as the comments accurately reflect the evidence. *State v. Akins*, 298 Kan. 592, Syl. ¶ 5, 315 P.3d 868 (2014).

The record is confusing on this point. On direct examination, the following

15

exchange occurred:

"Q.      And how many times have you testified in the state or federal district court of law as an expert, using the Widmark equation?

"A.      Well, we—depending upon the case, I may have used the Widmark formula to give an opinion on the concentration of an alcohol. But in terms of just pure Widmark, not many times."

Later, during voir dire of the witness, the State asked:

"Q.      Have you ever been permitted to testify in the state of Kansas as to someone's blood alcohol content at a particular time without starting from a known sample?

"A.      Well, can I explain? I mean, there's confusion here, Judge.
    "THE COURT: You may answer the question.

"A.      Of course I would be allowed to testify. I would not testify because—
    "[THE STATE]:   There you go.

"A.      —when you back extrapolate, you may be making a mistake unless you know where you are in the Widmark curve. All right? So you need to be very care careful when you back extrapolate. . . .

"Q.      You're saying you have to be careful in back extrapolating. But what if you don't even have anything to start from to extrapolate from? Have you ever been able to testify in a court in Kansas where you haven't started from a known sample?

. . . .

    "[DEFENSE]:   I'm going to object. We have a known sample. . . .
    "THE COURT:   I don't think we have a sample, do we? That's why we're here.
    "[THE STATE]:   We don't. That's the problem.

"Q.      Have you ever been permitted to testify as to what someone's blood alcohol content was without starting from a known blood alcohol sample of some sort?

"A.      Of course. I do that all the time when I give an opinion in a case, because I don't have a blood alcohol or breath alcohol. If I do have one, then, obviously, I don't need to worry about that. The Widmark formula we're using here, we're calculating forward. You're talking about back extrapolating. You're mixing oranges with apples.

. . . .

16

"Q.     Have you ever been permitted to testify in the state of Kansas in the manner in which you're being asked to testify today?

"A.     Probably not, because I never had a case like this."

In sum, the testimony was that the witness had testified in the manner he did in this case either "not many times" or "all the time." In the state of Kansas, he had "probably not" testified in that manner. We cannot offer any more clarity to this.

The prosecutor's comment probably did not accurately reflect the testimony. But when the defense attorney objected, the prosecutor quickly apologized and told the jury to review and use its own recollection of the testimony. Thus, there is no reasonable probability the error affected the outcome of the case.

Next, Darnell claims the prosecutor erred by making improper comments during her objections to the defense witness' testimony. He claims three comments were improper.

First, before the witness was qualified as an expert, the witness began answering more than what was asked. The prosecutor objected and said, "Your Honor, we might be getting ahead of the game. Maybe he's not answering exactly what [defense counsel] is asking. *I think he's got an agenda and he's hit it,* and we're not there yet." (Emphasis added.) The defense attorney asked another question without waiting for a ruling on the objection.

Darnell now contends the statement, "[H]e's got an agenda," was an impermissible comment on witness credibility.

We have previously noted that the trial judge was forced to admonish this witness several times to answer only the question that was asked. Still, the prosecutor's comment

17

may have been error. But there was little possibility that the comment affected the outcome of the trial.

The witness came up with Darnell's predicted blood alcohol concentration using what he called a "Widmark factor." He did no testing of Darnell's blood or urine. The expert acknowledged that a body's removal of blood alcohol from a person's bloodstream varies with each individual. He acknowledged that if the timeline he was given regarding how much and when Darnell drank over a 12-hour period was not accurate, then his finding would not be accurate either.

Further, he did not know whether a person's age factored into the analysis. He acknowledged that there were other variables. The witness testified that a normal person that had a .6 percent blood alcohol concentration level would be dead. But, in this case, Darnell was able to drive over to T.W.'s house. During the attack, Darnell functioned at a high level. He was able to think rationally and assess the situation. He was able to keep a continuous hold on T.W. He told T.W. to stop screaming and asked if anyone else was home. He got tissues so she could clean up her bloody nose. He told her he did not want to get her blood on him. Assuming the jury agreed that Darnell's blood alcohol concentration was .6, Darnell's actions during the night were evidence of his intent.

Second, the defense moved to admit a table using the "Widmark factor." The prosecutor objected to its admission: "My objection is the State contends there's no science to that table. And when you hand them out at Rotary, it says, Don't use this for anything but fun. And that's my objection." Again, context is important here. Just before the prosecutor's objection, the witness had testified:

"Because the Widmark factor is a constant, I can sit down and make a table. If I know a person's weight, how much alcohol they consumed, and the Widmark factor, I can set up a table:  The amount of alcohol they consume, and the weight, and we know

18

what the concentration of alcohol would be on those individuals.

"And, of course, if you're a member of Rotary, or whatever, they give you those little charts, alcohol, so many drinks, this would be what your concentration would be. They have a chart, a number of drinks, and then the weight of the individual. Just go down that chart, tells you, If you weigh 200 pounds, and you have 'A' drinks, then this would be the concentration of your blood alcohol sometime later on."

Darnell complains that the prosecutor's comments that there was "no science" to the "Widmark factor" and the table handed out at Rotary which said, "Don't use this for anything but fun," were facts not in evidence.

The prosecutor's comment that there was "no science" was part of its argument that the table should not be admissible. We find nothing prejudicial in this comment. Darnell's own witness testified that the tables were handed out at Rotary. Whether the tables handed out at Rotary said, "Don't use this for anything but fun," was not in evidence. But this statement was harmless for the same reasons as we have stated above.

Third, the defense attorney asked the witness what he calculated Darnell's blood alcohol concentration to be. The prosecutor then stated, "And just for the record—and I'm about [to] beat down on this—but I'm going to object. And it's not admissible in the state of Kansas in the courts." The expert responded that he calculated Darnell's blood alcohol concentration using the Widmark formula at around .6 percent. Darnell complains the comment "it's not admissible in the state of Kansas" was a fact not in evidence.

Here the State was stressing its point that the Widmark formula testimony should not be admissible in the State of Kansas. There was nothing improper with the State's objection. We find no reversible error in any of the prosecutor's comments.

19

*We reject Darnell's claim of cumulative error*

Darnell claims that cumulative error denied him a fair trial. At most, the errors were:

- The trial court's failure to give a limiting instruction on the prior crimes evidence;
- the prosecutor's comment during closing arguments that Darnell's expert witness had never before testified in the manner he did during the trial;
- the prosecutor's comment that the expert witness had an agenda; and
- the prosecutor's comment that the tables handed out at Rotary say they are just for "fun."

They are not significant. The prior crime evidence had no relation to the expert testimony and was harmless for the reasons we have already stated. Darnell was not prejudiced by the prosecutor's comments regarding the defense expert witness' testimony when viewed in context because the witness admitted that there were numerous variables that affected a person's blood alcohol concentration. The witness had to rely on the timeline of Darnell's drinking over a 12-hour period given to him by Darnell's girlfriend at the time of the crime. Darnell's behavior and demeanor during the home invasion were evidence that he acted intentionally. We hold there is no reason to reverse his convictions due to cumulative error.

*The court's order to pay witness expenses was proper.*

For his final point, Darnell contends the sentencing court lacked authority to order him to pay $1,295.98 to the Saline County Attorney's Office. He contends that restitution to the county attorney's office was not recoverable by statute. This is not restitution—it is court costs.

K.S.A. 2016 Supp. 28-172a(d) sets out a nonexclusive list of fees and expenses the trial court can assess as court costs. The list explicitly includes "witness fees" as an additional court cost. Another statute, K.S.A. 22-4203, specifically provides for payment of mileage for out-of-state witnesses summoned to testify.

It is well settled in Kansas that upon conviction in a criminal action the defendant is liable for the costs of both the prosecution and defense of the case. Costs may include witness travel expenses associated with the crimes of conviction. *State v. Lopez*, 36 Kan. App. 2d 723, 727, 143 P.3d 695 (2006).

In *State v. Alvarez*, No. 115,993, 2017 WL 1367057, at *2-3 (Kan. App. 2017) (unpublished opinion), a panel of this court concluded that the district court had authority to order the defendant to reimburse the prosecution for its expenses in developing photographs for trial exhibits as court costs. In *State v. Rother*, 23 Kan. App. 2d 443, 444, 931 P.2d 1268 (1997), this court held the court did not err in ordering the defendant to pay the expert witness fees incurred by the State.

Here, the court ordered Darnell to "reimburse the Saline County Attorney's Office $1,295.98 for costs associated with the case." The court had authority to order reimbursement of the State's costs for T.W.'s travel, lodging, and food expenses while she was testifying at trial. We see no reason to modify the court's order on this point.

Affirmed.